*601 Justice Kennedy
delivered the opinion of the Court.
These cases present the question whether the Clean Water Act and its implementing regulations require permits before channeled stormwater runoff from logging roads can be discharged into the navigable waters of the United States. Under the statute and its implementing regulations, a permit is required if the discharges are deemed to be “associated with industrial activity.” 33 U. S. C. § 1342(p)(2)(B). The Environmental Protection Agency (EPA or Agency), with the responsibility to enforce the Act, has issued a regulation defining the term “associated with industrial activity” to cover only discharges “from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant.” 40 CFR § 122.26(b)(14) (2006). The EPA interprets its regulation to exclude the type of stormwater discharges from logging roads at issue here. See Brief for United States as Amicus Curiae 24-27. For reasons now to be explained, the Court concludes the EPA’s determination is a reasonable interpretation of its own regulation; and, in consequence, deference is accorded to the interpretation under Auer v. Robbins, 519 U. S. 452, 461 (1997).
*602 I—I
A
Congress passed the Clean Water Act in 1972 to “restore and maintain the chemical, physical, and biological integrity of the Nation’s waters.” 86 Stat. 816, 33 U. S. C. § 1251(a). A central provision of the Act is its requirement that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States. See §§ 1311(a), 1362(12); EPA v. California ex rel. State Water Resources Control Bd., 426 U. S. 200, 205 (1976). The Act defines “point source” as
“any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.” § 1362(14).
When the Act took effect, the EPA found it difficult to process permit applications from countless owners and operators of point sources throughout the country. The Agency issued regulations exempting certain types of point-source discharges from the NPDES permitting scheme, but in 1977 those directives were found invalid. The Court of Appeals for the District of Columbia Circuit ruled that the statute did not give the EPA “authority to exempt categories of point sources from the permit requirements” of the Act. Natural Resources Defense Council, Inc. v. Costle, 568 F. 2d 1369, 1377. In response the EPA issued new regulations to define with more precision which categories of discharges qualified as point sources in the first place. Among these *603 regulations was the so-called Silvicultural Rule. This rule is at issue here. It provides:
“Silvicultural point source means any discernible, confined and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States. The term does not include non-point source silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control,' harvesting operations, surface drainage, or road construction and maintenance from which there is natural, runoff.” 40 CFR § 122.27(b)(1) (2006).
Under the quoted rule, any discharge from a logging-related source that qualifies as a point source requires an NPDES permit unless some other federal statutory provision exempts it from that coverage. In one such provision, 33 U. S. C. § 1342(p), Congress has exempted certain discharges of stormwater runoff. The statutory exemptions were considered necessary because, from the outset, the EPA had encountered recurring difficulties in determining how best to manage discharges of this kind. See, e. g., Natural Resources Defense Council, Inc. v. EPA, 966 F. 2d 1292, 1295-1296 (CA9 1992). In 1987, Congress responded to these problems and adopted various stormwater-related amendments to the Act. § 405, 101 Stat. 69, 33 U. S. C. § 1342(p).
The 1987 amendments exempt from the NPDES permitting scheme most “discharges composed entirely of stormwa-ter.” §1342(p)(l). The general exemption, however, does not extend to all stormwater discharges. As relevant here, Congress directed the EPA to continue to require permits for stormwater discharges “associated with industrial activ *604 ity.” § 1342(p)(2)(B). The statute does not define that term, but the EPA adopted a regulation (hereinafter Industrial Stormwater Rule) in which it defined it as
“the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant. The term does not include discharges from facilities or activities excluded from the NPDES program under this part 122. For the categories of industries identified in this section, the term includes, but is not limited to, storm water discharges from . . . immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility .. . .” 40 CFR § 122.26(b)(14).
The Industrial Stormwater Rule also specified that, with one exception not relevant here, “[f]acilities classified as Standard Industrial Classificatio[n] 24” are “considered to be engaging in ‘industrial activity’ for purposes of paragraph (b)(14).” Ibid. The Standard Industrial Classifications are a system used by federal agencies to categorize firms engaged in different types of business activity. See Dept, of Labor, Standard Industrial Classifications Manual, online at http://Avww.osha.gov/pls/imis/sic_manual.html (as visited Mar. 14, 2013, and available in Clerk of Court’s case file). Standard Industrial Classification 24 identifies industries involved in the field of “Lumber and Wood Products.” 2 App. 64. This includes the “Logging” industry, defined as “[e]s-tablishments primarily engaged in cutting timber and in producing . . . primary forest or wood raw materials.” Ibid.
On November 30, 2012—three days before the instant cases were argued in this Court—the EPA issued its final version of an amendment to the Industrial Stormwater Rule. The amendment was the Agency’s response to the Court of Appeals’ ruling now under review. The amended version *605 seeks to clarify the types of facilities within Standard Industrial Classification 24 that are deemed to be engaged in industrial activity for purposes of the rule. The amended Industrial Stormwater Rule does not cover all facilities within Standard Industrial .Classification 24. It limits covered stormwater discharges to
“ [facilities classified within Standard Industrial Classification 24, Industry Group 241 that are rock crushing, gravel washing, log sorting, or log storage facilities operated in connection with silvicultural activities . . . and Industry Groups 242 through 249.” 77 Fed. Reg. 72974, pt. 122, subpt. B (2012).
It should be noted, by way of explanation, that an Industry Group is a subcategory of businesses within a Standard Industrial Classification. Industry Group 241 is “Logging,” while Industry Groups 242 through 245 are, respectively, “Sawmills and Planing Mills,” “Millwork, Veneer, Plywood, and Structural Wood,” “Wood Containers,” and “Wood Buildings and Mobile Homes.” Industry Group 249 is “Miscellaneous Wood Products.” Industry Groups 246 through 248 are blank categories. Standard Industrial Classifications Manual, swpra, Major Group 24.
It is fair to say the purpose of the amended regulation is to bring within the NPDES permit process only those logging operations that involve the four types of activity (rock crushing, gravel washing, log sorting, and log storage facilities) that are defined as point sources by the explicit terms of the Silvicultural Rule.
Up to this stage in the litigation, of course, the cases have been concerned with the Industrial Stormwater Rule before the amendment adopted on November 30, 2012. The amended regulation will determine whether from this point forward NPDES permits will be required for the stormwa-ter discharges at issue. The parties disagree about the significance of the amended rule for purposes of these cases. *606 Before reaching this and other preliminary points, however, it is appropriate to set forth the facts and history of the cases leading to the proceedings in this Court.
B
At issue are discharges of channeled stormwater runoff from two logging roads in Oregon’s Tillamook State Forest, lying in the Pacific Coast Range about 40 miles west of Portland. Petitioner Georgia-Pacific West, along with other logging and paper-products companies, has a contract with the State of Oregon to harvest timber from the forest. It uses the roads for that purpose. When it rains (which it does often in the mountains of northwest Oregon, averaging in some areas more than 100 inches per year), water runs off the graded roads into a system of ditches, culverts, and channels that discharge the water into nearby rivers and streams. The discharges often contain large amounts of sediment, in the form of dirt and crushed gravel from the roads. There is evidence that this runoff can harm fish and other aquatic organisms.
In September 2006, respondent Northwest Environmental Defense Center (NEDC) filed suit in the United States District Court for the District of Oregon. It invoked the Clean Water Act’s citizen-suit provision, 33 U. S. C. § 1365, and named as defendants certain firms involved in logging and paper-products operations (including petitioner Georgia-Pacific West), as well as state and local governments and officials (including the state forester of Oregon, who is now petitioner Doug Decker). The suit alleged that the defendants caused discharges of channeled stormwater runoff into two waterways—the South Fork Trask River and the Little South Fork Rilchis River. The defendants had not obtained NPDES permits, and so, the suit alleged, they had violated the Act.
The District Court dismissed the action for failure to state a claim. It concluded that NPDES permits were not re *607 quired because the ditches, culverts, and channels were not point sources of pollution under the Act and the Silvicultural Rule. The Court of Appeals for the Ninth Circuit reversed. Northwest Environmental Defense Center v. Brown, 640 F. 3d 1063 (2011). It relied upon three principal propositions. First, it held that the District Court had subject-matter jurisdiction under § 1365 notwithstanding a different provision of the Act, 33 U. S. C. § 1369(b)(1), limiting judicial review of EPA regulations. Second, the Court of Appeals held that while the EPA’s Silvicultural Rule is ambiguous on the question whether the conveyances at issue are point sources, those conveyances must be deemed point sources under the rule in order to give effect to the Act’s expansive definition of the term. Third, the Court of Appeals held that because the Industrial Stormwater Rule makes cross-reference to Standard Industrial Classification 24, the discharges at issue are “associated with industrial activity” within the meaning of the regulation, despite the EPA’s conclusion to the contrary. The regulation was held to be unambiguous on this point. The Court of Appeals thus ruled that the discharges were from point sources and not exempt from the NPDES permitting scheme by the Industrial Stormwater Rule. It followed that petitioners had been in violation of the Act.
This Court granted certiorari. 567 U. S. 933 (2012).
H-f
Before proceeding to the merits, it is necessary to consider two jurisdictional questions.
A
Respondent NEDC invoked the jurisdiction of the District Court under 33 U. S. C. § 1365(a), which “authorize^] private enforcement of the provisions of [the Clean Water Act]” and its implementing regulations. Department of Energy v. Ohio, 503 U. S. 607, 613, n. 5 (1992). Petitioners, however, *608 maintain that this suit is barred by a separate provision of the Act, § 1369(b). That statute provides for “judicial review in the United States courts of appeals of various particular actions by the [EPA] Administrator, including establishment of effluent standards and issuance of permits for discharge of pollutants.” Middlesex County Sewerage Authority v. National Sea Clammers Assn., 453 U. S. 1, 13-14 (1981). Where that review is available, it is the exclusive means of challenging actions covered by the statute, § 1369(b)(2), and an application for review must be lodged in the court of appeals within 120 days of the Administrator’s action, § 1369(b)(1).
The Court of Appeals was correct to rule that the exclusive jurisdiction mandate is not applicable in this suit. Section 1369(b) extends only to certain suits challenging some Agency actions. It does not bar a district court from entertaining a citizen suit under § 1365 when the suit is against an alleged violator and seeks to enforce an obligation imposed by the Act or its regulations.
The present action is within the scope of § 1365. It is a claim to enforce what is at least a permissible reading of the Silvicultural Rule. The rule is ambiguous: Its characterization of silvicultural harvesting operations “from which there is natural runoff,” 40 CFR § 122.27(b)(1), as a nonpoint source might be read, as petitioners contend, to apply to the channeled stormwater runoff at issue; or it might be read, as respondent NEDC urges, to apply only to runoff not collected in channels or other engineered improvements. See New Oxford American Dictionary 1167 (3d ed. 2010) (Oxford Diet.) (“natural” means “existing in or caused by nature; not made or caused by humankind”). NEDC’s reading would make the channeled discharges here point-source pollution under the Act. In its view only this interpretation can be squared with the Act’s broad definition of “point source.” 33 U. S. C. § 1362(14). On this premise, the instant suit is an effort not *609 to challenge the Silvicultural Rule but to enforce it under a proper interpretation. It is a basic tenet that “regulations, in order to be valid, must be consistent with the statute under which they are promulgated.” United States v. Larionoff, 431 U. S. 864, 873 (1977).
For jurisdictional purposes, it is unnecessary to determine whether NEDC is correct in arguing that only its reading of the Silvicultural Rule is permitted under the Act. It suffices to note that NEDC urges the Court to adopt a “purposeful but permissible reading of the regulation ... to bring it into harmony with . . . the statute.” Environmental Defense v. Duke Energy Corp., 549 U. S. 561, 573 (2007). NEDC does not seek “an implicit declaration that the . . . regulations were invalid as written.” Ibid. And, as a result, § 1369(b) is not a jurisdictional bar to this suit.
B
“It is a basic principle of Article III that a justiciable case or controversy must remain extant at all stages of review, not merely at the time the complaint is filed.” United States v. Juvenile Male, 564 U. S. 932, 936 (2011) (per curiam) (internal quotation marks omitted). This principle requires us to determine whether the EPA’s recent amendment to the Industrial Stormwater Rule makes the cases moot. In a supplemental brief filed after oral argument, petitioner Decker, joined by the United States as amicus curiae, takes the position that the recent amendment makes these cases moot in relevant part. See Supp. Brief for Petitioners in No. 11-338, pp. 4-6; Supp. Brief for United States 4-8.
That conclusion is incorrect. “A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.” Knox v. Service Employees, 567 U. S. 298, 307 (2012) (internal quotation marks omitted). Here, despite the recent amendment, a live controversy continues to exist regarding whether petitioners *610 may be held liable for unlawful discharges under the earlier version of the Industrial Stormwater Rule.
Respondent NEDC continues to press its claim that petitioners’ discharges are unlawful under both the amended regulation and the earlier version. See Supp. Brief for Respondent 3-13. The instant cases provide no occasion to interpret the amended regulation. “ ‘[W]e are a court of review, not of first view.’ ” Arkansas Game and Fish Comm’n v. United States, ante, at 37 (quoting Cutter v. Wilkinson, 544 U. S. 709, 718, n. 7 (2005)). The parties, however, have litigated the suit extensively based on the earlier version of the Industrial Stormwater Rule; and that version governed petitioners’ past discharges, which might be the basis for the imposition of penalties even if, in the future, those types of discharges will not require a permit.
If the Court of Appeals is correct that petitioners were obligated to secure NPDES permits before discharging channeled stormwater runoff, the District Court might order some remedy for their past violations. The Act contemplates civil penalties of up to $25,000 per day, 33 U. S. C. § 1319(d), as well as attorney’s fees for prevailing parties, § 1365(d). NEDC, in addition, requests injunctive relief for both past and ongoing violations, in part in the form of an order that petitioners incur certain environmental-remediation costs to alleviate harms attributable to their past discharges. Under these circumstances, the cases remain live and justiciable, for the possibility of some remedy for a proven past violation is real and not remote. See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U. S. 49, 64-65 (1987). The District Court, it is true, might rule that NEDC’s arguments lack merit, or that the relief it seeks is not warranted on the facts of these cases. That possibility, however, does not make the cases moot. “There may be jurisdiction and yet an absence of merits.” General Investment Co. v. New York Central R. Co., 271 U. S. 228, 230 (1926).
*611 1—1 )—H HH
The substantive question of the necessity for an NPDES permit under the earlier rule now must be addressed. Under the Act, petitioners were required to secure NPDES permits for the discharges of channeled stormwater runoff only if the discharges were “associated with industrial activity,” 33 U. S. C. § 1342(p)(2)(B), as that statutory term is defined in the preamendment version of the Industrial Stormwater Rule, 40 CFR § 122.26(b)(14). Otherwise, the discharges fall within the Act’s general exemption of “discharges composed entirely of stormwater” from the NPDES permitting scheme. 33 U. S. C. § 1342(p)(l).
NEDC first contends that the statutory term “associated with industrial activity” unambiguously covers discharges of channeled stormwater runoff from logging roads. See Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-843 (1984). That view, however, overlooks the multiple definitions of the terms “industrial” and “industry.” These words can refer to business activity in general, yet so too can they be limited to “economic activity concerned with the processing of raw materials and manufacture of goods in factories.” Oxford Diet. 887. The latter definition does not necessarily encompass outdoor timber harvesting. The statute does not foreclose more specific definition by the Agency, since it provides no further detail as to its intended scope.
Somewhat more plausible is NEDC’s claim that the pre-amendment version of the Industrial Stormwater Rule unambiguously required a permit for the discharges at issue. NEDC reasons that under the rule, “[f]or the categories of industries identified in this section,” NPDES permits are required for, among other things, “storm water discharges from . . . immediate access roads . . . used or traveled by carriers of raw materials.” 40 CFR § 122.26(b)(14). Yet this raises the question whether logging is a “categor[y] of industr[y]” identified by the section. The regulation goes *612 on to identify a list of “categories of facilities” that “are considered to be engaging in ‘industrial activity’ for purposes” of the Industrial Stormwater Rule. Ibid. In the earlier version of the regulation, this list included “[facilities classified as Standard Industrial Classification] 24,” which encompasses “Logging.” Ibid. See also supra, at 604. Hence, NEDC asserts, logging is among the categories of industries for which “storm water discharges from... immediate access roads . . . used or traveled by carriers of raw materials” required NPDES permits under the earlier version of the Industrial Stormwater Rule. § 122.26(b)(14). NEDC further notes, in support of its reading of the regulation, that modern logging is a large-scale, highly mechanized enterprise, using sophisticated harvesting machines weighing up to 20 tons. See Brief for Respondent 4-5.
The EPA takes a different view. It concludes that the earlier regulation invoked Standard Industrial Classification 24 “ ‘to regulate traditional industrial sources such as sawmills.’” Brief for United States as Amicus Curiae 24-25. It points to the regulation’s reference to “facilities” and the classification’s reference to “establishments,” which suggest industrial sites more fixed and permanent than outdoor timber-harvesting operations. Ibid. See also 55 Fed. Reg. 47990, 48008 (1990). This reading is reinforced by the Industrial Stormwater Rule’s definition of discharges associated with industrial activity as discharges “from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant.” 40 CFR § 122.26(b)(14). This language lends support to the EPA’s claim that the regulation does not cover temporary, outdoor logging installations. It was reasonable for the Agency to conclude that the conveyances at issue are “directly related” only to the harvesting of raw materials, rather than to “manufacturing,” “processing,” or “raw materials storage areas.” See Oxford Diet. 1066 (manufacturing is “mak[ing] (some *613 thing) on a large scale using machinery”); id., at 1392 (processing is “perform[ing] a series of mechanical or chemical operations on (something) in order to change or preserve it”). In addition, even if logging as a general matter is a type of economic activity within , the regulation’s scope, a reasonable interpretation of the regulation could still require the discharges to be related in a direct way to operations “at an industrial plant” in order to be subject to NPDES permitting.
NEDC resists this conclusion, noting that elsewhere in the Industrial Stormwater Rule the EPA has required NPDES permits for stormwater discharges associated with other types of outdoor economic activity. See § 122.26(b)(14)(iii) (mining); § 122.26(b)(14)(v) (landfills receiving industrial waste); § 122.26(b)(14)(x) (large construction sites). The EPA reasonably could conclude, however, that these types of activities tend to be more fixed and permanent than timber-harvesting operations are and have a closer connection to traditional industrial sites. In light of the language of the regulation just discussed, moreover, the inclusion of these types of economic activity in the Industrial Stormwater Rule need not be read to mandate that all stormwater discharges related to these activities fall within the rule, just as the inclusion of logging need not be read to extend to all discharges from logging sites. The regulation’s reach may be limited by the requirement that the discharges be “directly related to manufacturing, processing or raw materials storage areas at an industrial plant.” § 122.26(b)(14).
It is well established that an agency’s interpretation need not be the only possible reading of a regulation—or even the best one—to prevail. When an agency interprets its own regulation, the Court, as a general rule, defers to it “unless that interpretation is ‘plainly erroneous or inconsistent with the regulation.’” Chase Bank USA, N. A. v. McCoy, 562 U. S. 195, 208 (2011) (quoting Auer, 519 U. S., at 461). The EPA’s interpretation is a permissible one. Taken together, *614 the regulation’s references to “facilities,” “establishments,” “manufacturing,” “processing,” and an “industrial plant” leave open the rational interpretation that the regulation extends only to traditional industrial buildings such as factories and associated sites, as well as other relatively fixed facilities.
There is another reason to accord Auer deference to the EPA’s interpretation: There is no indication that its current view is a change from prior practice or a post hoc justification adopted in response to litigation. See Christopher v. SmithKline Beecham Corp., 567 U. S. 142, 155 (2012). The opposite is the case. The Agency has been consistent in its view that the types of discharges at issue here do not require NPDES permits.
The EPA’s decision exists against a background of state regulation with respect to stormwater runoff from logging roads. The State of Oregon has made an extensive effort to develop a comprehensive set of best practices to manage stormwater runoff from logging roads. These practices include rules mandating filtration of stormwater runoff before it enters rivers and streams, Ore. Admin. Rule 629-625-0330(4) (2012); requiring logging companies to construct roads using surfacing that minimizes the sediment in runoff, Rule 629-625-0700(2); and obligating firms to cease operations where such efforts fail to prevent visible increases in water turbidity, Rule 629-625-0700(3). Oregon has invested substantial time and money in establishing these practices. In addition, the development, siting, maintenance, and regulation of roads—and in particular of state forest roads—are areas in which Oregon has considerable expertise. In exercising the broad discretion the Act gives the EPA in the realm of stormwater runoff, the Agency could reasonably have concluded that further federal regulation in this area would be duplicative or counterproductive. Indeed, Congress has given express instructions to the EPA to work “in consultation with State and local officials” to alie- *615 viate stormwater pollution by developing the precise kind of best management practices Oregon has established here. 33 U. S. C. § 1342(p)(6).
[[Image here]]
The preamendment version of the Industrial Stormwater Rule, as permissibly construed by the Agency, exempts discharges of channeled stormwater runoff from logging roads from the NPDES permitting scheme. As a result, there is no need to reach petitioners’ alternative argument that the conveyances in question are not “pipe[s], ditch[es], channels], tunnel[s], conduit[s],” or any other type of point source within the Act’s definition of the term. § 1362(14).
For the reasons stated, the judgment of the Court of Appeals is reversed, and the cases are remanded for proceedings consistent with this opinion.

It is so ordered.

Justice Breyer took no part in the consideration or decision of these cases.