# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

No. 18-60227

June 10, 2019

Lyle W. Cayce
Clerk

FORREST GENERAL HOSPITAL; SOUTHWEST MISSISSIPPI REGIONAL MEDICAL CENTER,

>    Plaintiffs–Appellants

v.

ALEX M. AZAR, II, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

>    Defendant–Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before REAVLEY, ELROD, and WILLETT, Circuit Judges.

DON R. WILLETT, Circuit Judge:

One tricky area of America's uniquely complex healthcare "system" is the labyrinth of acronyms and formulae that govern Medicare funding. In this appeal, two Mississippi hospitals insist that the federal government skimped on their Disproportionate Share Hospital (or DSH—pronounced "dish") payments—special funding to institutions serving large numbers of indigent patients. To determine if the hospitals were rightly compensated, we must determine if a certain DSH-related fraction—specifically the numerator—was rightly calculated. The answer, though, turns less on figuring numbers than on figuring out words. And all language cases share a common denominator: Judges must defer to plain language, not to parties seeking to elude it.

No. 18-60227

Here, the district court gave "substantial deference" to the interpretation of the Department of Health and Human Services (HHS), which read the relevant statute and regulation to exclude from the numerator Mississippi's uncompensated care pool (UCCP) patient days.[1] Upshot: smaller numerator, smaller fraction, smaller funding. But HHS's reading of the fraction was improper, as was the district court's deference to it. The governing provisions unambiguously require HHS to *include* such patient days. By excluding instead of including, HHS committed a fraction infraction—and flouted the law's plain language.

As HHS's position is foreclosed by the text and structure of the relevant provisions, we REVERSE the district court's judgment and REMAND to the Medicare Administrative Contractor (MAC) to include the UCCP days in the hospitals' DSH calculation.

## I. Background

### A.    The Statutory and Regulatory Framework

Medicare is a federal health insurance program for the elderly and disabled.[2] It is, as the Supreme Court recently observed, America's "largest federal program after Social Security," spending roughly "$700 billion annually to provide health insurance for nearly 60 million aged or disabled Americans, nearly one-fifth of the Nation's population."[3] Together, Social Security and Medicare make up about 60 percent of all federal spending.

Medicare compensates hospitals for inpatient services under a prospective payment system, which determines national rates for various services.[4] These rates are subject to myriad adjustments.[5] This case deals with

---

[1] *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 580 (5th Cir. 2016).

[2] *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1994).

[3] *Azar v. Allina Health Servs.*, —S. Ct.—, 2019 WL 2331304, at *2 (June 3, 2019).

[4] 42 U.S.C. § 1395ww(d).

[5] *See id.*

2

No. 18-60227

a Medicare adjustment for DSH hospitals—those that serve a "significantly disproportionate number of low-income patients."[6]

Whether and to what extent a hospital qualifies for a Medicare DSH adjustment hinges on how many days a hospital treated people who are eligible for Medicaid (not to be confused with Medicare). Medicaid, the *third*-largest mandatory program in the federal budget,[7] is the cooperative federal-state health insurance program for low-income people.[8] HHS calculates a hospital's DSH adjustment using a formula called the "disproportionate patient percentage."[9] The "disproportionate patient percentage" is the sum of two fractions, a Medicare fraction and a Medicaid fraction. This case deals with the Medicaid fraction:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid], but who were not entitled to benefits under [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.[10]

When making a DSH calculation you have to ask how many days a hospital treated "patients who . . . were eligible for medical assistance under a State plan approved under [Medicaid]."[11] But there's a little more to it. When Congress passed the Deficit Reduction Act of 2005, it added this to the DSH Medicaid fraction statute:

---

[6] *Id.* § 1395ww(d)(5)(F)(i)(I).

[7] Elizabeth Hinton, Kendal Orgera, and Robin Rudowitz, *Medicaid Financing: The Basics*, KAISER FAMILY FOUNDATION (Mar. 21, 2019), https://www.kff.org/medicaid/issue-brief/medicaid-financing-the-basics/view/print/. While Medicaid is the third-largest *program* in the budget, it will soon be surpassed by interest payments on the national debt, the fastest-growing part of the budget and a mandatory expense if not a mandatory program.

[8] *See* 42 U.S.C. § 1396 *et seq.*

[9] *Id.* § 1395ww(d)(5)(F)(v)–(vi).

[10] *Id.* § 1395ww(d)(5)(F)(vi)(II).

[11] *Id.*

No. 18-60227

> In determining [the Medicaid fraction,] the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid], the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.[12]

So, the Medicaid fraction's numerator includes both (1) days a hospital treated patients who were Medicaid-eligible, and (2) days a hospital treated patients who are regarded as Medicaid-eligible because they received demonstration project benefits. What are demonstration projects? A little more context is in order.

One does not simply receive federal funding.[13] To participate in the Medicaid program, a state must submit a plan for medical assistance to the Centers for Medicare & Medicaid Services (CMS) for approval (this is called the "State plan"). The State plan must specify who will receive medical assistance, what kind of medical care and services will be offered, and so on.[14] CMS must then approve the plan.[15] Once a plan is approved, a state may receive matching payments from the federal government based on amounts that the state "expended . . . as medical assistance under the State plan."[16]

Title XI § 1115 of the Social Security Act, however, authorizes the Secretary of HHS to waive certain Medicaid requirements for experimental, pilot, or demonstration projects that, in his judgment, will "assist in promoting

---

[12] Deficit Reduction Act of 2005, Pub. L. No. 109–171, § 5002(a), 120 Stat. 4 (2006), *codified at* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

[13] THE LORD OF THE RINGS: THE FELLOWSHIP OF THE RING (New Line Cinema 2001) ("One does not simply walk into Mordor.").

[14] 42 U.S.C. § 1396a(a)(10)(A).

[15] 42 U.S.C. § 1396a(a), (b); 42 C.F.R. §§ 430.10, 430.15.

[16] *See id.* § 1396b(a)(1).

the objectives of [Medicaid]."[17] In other words, these § 1115 waivers are Congress's green light to the Secretary to relax the usual state-plan-approval requirements. Section 1115 waivers "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under [Medicaid]."[18] Thus, these § 1115 demonstration projects provide benefits to people who wouldn't otherwise be eligible for Medicaid benefits; and the costs of these benefits are treated as if they are matchable Medicaid expenditures. This is crucial for our case because patients who were ineligible for Medicaid but received benefits under a § 1115 demonstration project count for Medicaid fraction numerator purposes—resulting in a beefier reimbursement for hospitals.

We've introduced the major statutory puzzle pieces. But there's a regulatory piece too, 42 C.F.R. § 412.106(b)(4). That regulation says:

> (4) Second computation. The fiscal intermediary determines . . . the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period. For purposes of this second computation, the following requirements apply:
>
> (i) For purposes of this computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.
>
> (ii) . . . [H]ospitals may include all days attributable to populations eligible for [Medicaid] matching payments through a waiver approved under section 1115 of the Social Security Act.[19]

---

[17] *See* Public Welfare Amendments of 1962, Pub. L. No. 87–543, § 122, 76 Stat. 172, 192, *codified at* 42 U.S.C. § 1315.

[18] 42 U.S.C. § 1315(a)(2).

[19] 42 C.F.R. § 412.106(b)(4).

No. 18-60227

This regulation is straightforward. The fiscal intermediary—a private third party tasked with auditing, reporting, and reimbursing hospitals through Medicare and Medicaid—must figure out which days to include in the Medicaid fraction numerator. From here, 42 C.F.R. § 412.106(b)(4)(i) describes a necessary condition: If a day is going to be included in the numerator, the patient underlying that day must have either (1) been "eligible for inpatient hospital services under an approved State Medicaid plan,"—the State plan that goes through the typical HHS approval process—or (2) eligible "under a waiver authorized under section 1115(a)(2)." Subsection (ii) lays out a sufficient condition, giving hospitals permission to go ahead and include days attributed to § 1115 populations.[20]

## B.   The Deficit Reduction Act of 2005 and Hurricane Katrina

We noted above how the Deficit Reduction Act modified the Medicaid fraction statute (by tacking on the "regarded as such" language). But the Act also funded a Hurricane Katrina demonstration project:

> (a) IN GENERAL.—The Secretary . . . shall pay to each eligible State . . . :
>
> (1) Under the authority of an approved Multi–State Section 1115 Demonstration Project . . .
>
> (A) with respect to evacuees receiving health care under such project, for the non-Federal share of expenditures:
>
> (i) for medical assistance furnished under [Medicaid], and
>
> (ii) for child health assistance furnished under [Medicare];
>
> (B) with respect to evacuees who do not have other coverage for such assistance through insurance, including (but not limited to) private insurance, under [Medicaid] or [Medicare], or under State-funded health insurance programs, for the total uncompensated care costs incurred for medically necessary services and supplies or premium assistance for such persons, and for those evacuees receiving medical assistance under the project for the total

---

[20] 42 C.F.R. § 412.106(b)(4)(ii).

uncompensated care costs incurred for medically necessary services and supplies beyond those included as medical assistance or child health assistance under the State's approved plan under [Medicaid] or [Medicare] . . . .[21]

Combined with the rest of the Deficit Reduction Act of 2005, this boils down to: Congress directs the Secretary to approve a large demonstration project.[22] From here, the statute breaks down funding for health care services into four populations: (1) evacuees receiving health care under the project; (2) affected individuals (people located in disaster relief counties) receiving health care under the project;[23] (3) evacuees who were uninsured and not Medicaid-eligible; and (4) affected individuals who were uninsured and not Medicaid-eligible.[24]

The "non-Federal share" funds go towards the share of costs that State Medicaid programs would've had to bear anyway—costs that were eligible for federal matching funds under Medicaid. Conversely, costs of care for uninsured, non-Medicaid-eligible individuals and evacuees—costs that the State Medicaid programs and federal funds would not normally have covered—were simply covered by federal funds appropriated under the Deficit Reduction Act not related to Medicaid funds.

In September 2005, CMS approved Mississippi's § 1115 waiver to provide Medicaid and State Children's Health Insurance Program (SCHIP) coverage for evacuees displaced from Louisiana, Mississippi, Alabama, and Florida, and those otherwise affected by Hurricane Katrina. The demonstration project extended and expedited Medicaid/SCHIP eligibility to

---

[21] Deficit Reduction Act of 2005, Pub. L. No. 109–171, § 6201(a)(1)(A)–(B), 120 Stat. 4 (2006).

[22] *Id.* § 6201(a)(1).

[23] *Id.* § 6201(a)(1)(C).

[24] *Id.* § 6201(a)(1)(D).

individuals who were displaced to Mississippi because of Katrina and met certain income-eligibility standards.

The demonstration project also permitted Mississippi to reimburse providers that incurred uncompensated care costs for medically necessary services and supplies for Katrina evacuees and affected individuals who did not have coverage under Medicare, Medicaid, SCHIP, private insurance, or under State-funded health insurance programs for a five-month period—the uncompensated care pool (UCCP). CMS approved Mississippi's UCCP in the September letter and UCCP plan details in a March 2006 letter.

Because of the unanticipated surge of patients post-Katrina, Mississippi's Medicaid program had no way to receive and electronically process claims under the § 1115 waiver. Instead, hospitals were directed to submit paper claims in "batches" of 50 that did not differentiate between Medicaid-eligible evacuees and affected individuals under the UCCP pool. The hospitals in this case counted inpatient days for all individuals who received inpatient services (in other words, "Katrina days") under the waiver in the Medicaid fraction numerator in their 2005 and 2006 cost reports—including UCCP patient days.

## C.    The Administrative and Judicial Proceedings Below

The Medicare Administrative Contractor excluded all UCCP days in the final settlement of the hospitals' cost reports. The hospitals appealed the Contractor's decision to the Provider Reimbursement Review Board. The Review Board reasoned that the plain statutory and regulatory text governing the DSH adjustment requires all inpatient days provided under the Katrina waiver to be included in the Medicaid fraction numerator; the UCCP was under the Katrina waiver, so UCCP days go into the numerator.

Having lost that round, HHS appealed to the CMS Administrator. The Administrator analogized the Mississippi UCCP to state-only general

assistance days and charity care/uncompensated care days, noting that courts have consistently held that such days don't involve patients who are "eligible for medical assistance under a State plan approved under [Medicaid]."[25] The Administrator reiterated that days the hospitals treated UCCP patients were not days involving patients who "were eligible for medical assistance under a State plan approved under [Medicaid]."[26] The Administrator also thought that UCCP days weren't "attributable to populations eligible for [Medicaid] matching payments through a waiver approved under section 1115" and were excluded from the DSH adjustment by regulation.[27] So the Administrator excluded the UCCP days from the Medicaid fraction.

The district court agreed with the Administrator. The district court began by explaining how deferential the standard of review is. Believing that it was required to give "substantial deference to an agency's construction of a statute that it administers," the district court tipped the scales in HHS's favor.[28] Like the Administrator below, the district court analogized the Mississippi UCCP to state charity care days. Accordingly, the district court found that the UCCP patients were not "considered [Medicaid] beneficiaries" and not "eligible for benefits under a Section 1115 waiver." It believed that the HHS approval letters' text, program details/logistics, and different sources of funding all pointed to one conclusion: The UCCP was not part of any § 1115 demonstration project.

---

[25] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); *see also Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176 (D.C. Cir. 2008); *Cooper Univ. Hosp. v. Sebelius*, 686 F. Supp. 2d 483 (D.N.J. 2009); *Univ. of Wash. Med. Ctr. v. Sebelius*, 634 F.3d 1029 (9th Cir. 2011). Pertinently, these cases don't deal with the Medicaid fraction statute's next portion, the "regarded as such" portion.

[26] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

[27] *See* 42 C.F.R. § 412.106(b)(4)(ii).

[28] *See Army Corps of Eng'rs*, 834 F.3d at 580.

On appeal, the hospitals argue that the district court got it all wrong. The hospitals maintain that excluding the UCCP patient days runs contrary to statutory and regulatory directives that plainly require just the opposite. Moreover, the letters HHS sent to Mississippi approving payments under the § 1115 project establish that the UCCP patient days fall under the § 1115 waiver's authority.

HHS agrees that the Secretary may "include patient days of patients not [eligible for Medicaid] but who are regarded as such because they receive benefits under a demonstration project."[29] But HHS thinks UCCP patients didn't receive benefits under a demonstration project.

## II. Discussion

The rules governing jurisdiction and our standard of review are familiar.

*Jurisdiction.* The district court had jurisdiction to review the Secretary's final decision under Title XVIII of the Social Security Act.[30] And we have jurisdiction over the hospitals' appeal under 28 U.S.C. § 1291.

*Standard of review.* Our review of a summary-judgment grant is de novo, "applying the same standard as the district court."[31] Under Rule 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[32]

## A.    The DSH Statute and Regulation are Unambiguous, so HHS's Interpretations are Owed No Deference under *Chevron* and *Auer*.

HHS contends that its legal interpretations must be upheld under the *Chevron* and *Auer* judicial deference doctrines. We disagree. Judicial deference requires textual ambiguity, and here, the DSH statute and regulation

---

[29] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).
[30] 42 U.S.C. § 1395oo(f)(1).
[31] *Moon v. City of El Paso*, 906 F.3d 352, 357 (5th Cir. 2018).
[32] FED. R. CIV. P. 56(a).

unambiguously cut the hospitals' way. There is no haziness—neither congressional nor administrative. And absent ambiguity, our ingenious design of constitutionally separated powers assigns the duty of interpreting the law to judges, not to regulators.[33]

## 1. HHS's statutory interpretation deserves no deference under *Chevron*.

Under *Chevron,* a 35-year-old pillar of the administrative state, we defer to reasonable agency interpretations of ambiguous statutes "unless they are arbitrary, capricious, or manifestly contrary to the statute."[34] But *Chevron* deference must be reflective, not reflexive. If statutory text is unambiguous, that's that—no deference is due. The Constitution, after all, vests lawmaking power in Congress.[35] How much lawmaking power? "All," declares the Constitution's first substantive word. And Congress's statutes define the scope of agencies' power. Under bedrock separation-of-powers principles, Article III courts need not—indeed *must* not—outsource their constitutionally assigned interpretive duty to Article II agencies when the Article I Congress has spoken clearly. The integrity of our constitutional framework requires judges to fulfill "their duty as faithful guardians of the Constitution."[36] Chief Justice Marshall was unsubtle: "It is emphatically the province and duty of the judicial department to say what the law is."[37] The judiciary is a constitutional partner, but not a junior partner.

---

[33] "The interpretation of the laws is the proper and peculiar province of the courts." THE FEDERALIST NO. 78, at 525 (Alexander Hamilton) (J. Cooke ed., 1961).

[34] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

[35] "All legislative Powers herein granted shall be vested in a Congress." U.S. CONST. art. I.

[36] THE FEDERALIST NO. 78, at 528 (Alexander Hamilton) (J. Cooke ed., 1961).

[37] *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

No. 18-60227

Step One of *Chevron* analysis asks whether the statutory text is ambiguous.[38] If it is—and *only* if it is—courts then defer to agencies' reasonable interpretations.[39] But if the statute is *not* ambiguous, then the agency's interpretation gets no deference.[40]

In this case, we hold that the governing statutory text is clear, meaning HHS's interpretation is owed no *Chevron* deference. Section 1395ww(d)(5)(F)(vi)(II) says to include days that a hospital treated patients eligible under a Medicaid-approved state plan in the Medicaid fraction's numerator. And if the Secretary approves a demonstration project, then we regard patient days involving patients who "receive benefits under a demonstration project" as if they were patient days attributable to Medicaid-eligible patients (which means those days also go into the numerator). Put bluntly: Certain days just go into the Medicaid fraction's numerator. Which days? Days that a hospital treated Medicaid-eligible patients or—if the Secretary approves a demonstration project—patients regarded as Medicaid eligible because of a demonstration project. This is binary: Patient days are either in or out. If patients underlying a given day were Medicaid-eligible or "receive[d] benefits under a demonstration project," then that day goes into the numerator. Period. Otherwise, a patient day is out.

Just as the statute's mechanics are straightforward, so too are its words. The word "eligible" is generally construed to mean "capable of receiving."[41] The statute also explains that a qualifying patient must either be (i) Medicaid-

---

[38] *Luminant Generation Co. v. EPA*, 714 F.3d 841, 850–52 (5th Cir. 2013); *Army Corps of Eng'rs*, 834 F.3d at 585–86.

[39] *Luminant*, 714 F.3d at 850, 857.

[40] *See id.* at 850–51.

[41] *See Covenant Health Sys. v. Sebelius*, 820 F. Supp. 2d 4, 12 (D.D.C. 2011); *accord Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 274 (6th Cir. 1994); *see also Eligible*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "eligible" as "[f]it and proper to be selected or to receive a benefit").

eligible or (ii) "regarded as such."[42] According to the Oxford English Dictionary, "regarded" can mean "[t]o hold (a person) in (a specified degree of) esteem" or to "heed or take into account in determining action or conduct."[43] In other words, the statute directs us to take certain patients "into account" in determining the fiscal intermediary's "action or conduct"—calculating the Medicaid fraction—even though they aren't *actually* Medicaid eligible. The statute explains that we are to "regard" such patients this way because they "*receive benefits* under a demonstration project."[44] According to Black's Law Dictionary, to "receive" means "[t]o take (something offered, given, sent, etc.); to come into possession of or get from some outside source <to receive presents>."[45] Additionally, Black's Law Dictionary defines a "benefit" as the "advantage or privilege something gives; the helpful or useful effect something has."[46] This means the fiscal intermediary must look to see who was capable of taking something offered (receiving); and that something offered must have had a helpful or useful effect (benefit). Finally, qualifying patients who are not *actually* Medicaid-eligible but are "regarded as such," must "receive benefits *under* a demonstration project."[47] The natural reading of "under" is "subject or pursuant to" or "by reason of the authority of."[48]

When we piece all of this together as a cohesive whole, the statute means that patients who aren't *actually* Medicaid-eligible still count towards the Medicaid fraction's numerator if they're considered or accounted to be capable

---

[42] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

[43] *See* The Oxford English Dictionary (online ed. 2019), available at http://www.oed.com/view/Entry/161187?rskey=YsWG0R&result=1&isAdvanced=false#eid.

[44] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).

[45] *Receive*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[46] *Benefit*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[47] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).

[48] *Ardestani v. Immigration & Naturalization Serv.*, 502 U.S. 129, 135 (1991) (cleaned up); *see also Under,* BLACK'S LAW DICTIONARY (10th ed. 2014) (remarking that "[t]he word 'under' has many dictionary definitions and must draw its meaning from its context").

of receiving a demonstration project's helpful or useful effects by reason of a demonstration project's authority. There's only one plausible way to read this. Thus, the statute is unambiguous, and HHS's contrary interpretation is entitled to no deference under *Chevron*.

## 2.    HHS's regulatory interpretation deserves no deference under *Auer*.

*Chevron* deference (regarding ambiguous statutes) has a less-famous doctrinal cousin: *Auer* deference (regarding ambiguous regulations). Under *Auer v. Robbins*[49]—currently under reconsideration at the Supreme Court[50]—an agency's interpretation of its own ambiguous regulation is generally controlling unless "plainly erroneous or inconsistent with the regulation."[51] While unanimous and initially uncontroversial, *Auer* has lost its luster over the years, weathering unsparing criticism from commentators[52] and jurists,[53] including *Auer*'s author, the late Justice Scalia, who did not stay an *Auer* fan

---

[49] 519 U.S. 452 (1997).

[50] *Kisor v. Shulkin*, 869 F.3d 1360 (Fed. Cir. 2017), *cert. granted sub nom. Kisor v. Wilkie*, 137 S. Ct. 657 (U.S. Dec. 10, 2018) (limiting the grant to petition's first question, whether the Supreme Court should overrule *Auer v. Robbins* and *Bowles v. Seminole Rock & Sand Co.*, which direct courts to defer to an agency's reasonable interpretation of its own ambiguous regulation).

[51] *See Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 454 (5th Cir. 2015) (quotation marks omitted) (citing *Auer*, 519 U.S. 461–62).

[52] *See, e.g.,* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 COLUM. L. REV. 612, 669 (1996) (arguing that such deference "disserves the due process objectives of giving notice of the law to those who must comply with it and of constraining those who enforce it"); Jeffrey A. Pojanowski, *Revisiting Seminole Rock*, 16 GEO. J.L. & PUB. POL'Y 87, 88 (2018).

[53] *See, e.g., Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1213–25 (Thomas, J., dissenting) (identifying "serious constitutional questions lurking beneath" the *Auer* doctrine); *id.* at 1210–11 (Alito, J., concurring in part and in the judgment) (noting that Justices Scalia and Thomas have offered "substantial reasons why the *Seminole Rock* doctrine may be incorrect"); *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 616 (2013) (Roberts, C.J., concurring) (noting "some interest in reconsidering" *Auer* deference); Brett Kavanaugh, Keynote Address at the Center for the Administrative State Public Policy Conference: Rethinking Judicial Deference (June 2, 2016) ("I believe that Justice Scalia's dissent in [*Decker*] will become the law of the land").

for long, branding it one of the Court's "worst decisions ever."[54] *Auer*'s hours seem numbered.

In practice, *Auer* deference mirrors *Chevron* deference. As with *Chevron* analysis, we first evaluate whether the regulation is ambiguous.[55] If it is, then we defer to HHS's interpretation. But if the regulation's plain language is unambiguous, HHS's interpretation is entitled to no deference.[56]

In this case, the regulation, like the statute, is unambiguous, making *Auer* deference inappropriate. Recall the language of 42 C.F.R. § 412.106(b)(4):

> (4) Second computation. The fiscal intermediary determines . . . the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to [Medicare], and divides that number by the total number of patient days in the same period. For purposes of this second computation, the following requirements apply:

> (i) For purposes of [the DSH numerator] computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.

> (ii) . . . hospitals may include all days attributable to populations eligible for [Medicaid] matching payments through a waiver approved under section 1115 of the Social Security Act.[57]

---

[54] *See* Clarence Thomas, *A Tribute to Justice Antonin Scalia*, 126 YALE L. J. 1600, 1603 (2017); *see also Perez*, 135 S. Ct. at 1211–13 (Scalia, J., concurring) (arguing that *Auer* deference undermines procedural safeguards for administrative policymaking); *Decker*, 568 U.S. at 616–26 (Scalia, J., concurring in part and dissenting in part) (lamenting that by making agencies both rule-drafter and rule-expositor, *Auer* "contravenes one of the great rules of separation of powers"); *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 67 (2011) (Scalia, J., concurring) (observing that although *Auer* "seems to be a natural corollary—indeed, an *a fortiori* application—of the rule that we will defer to an agency's interpretation . . . it is not").

[55] *Army Corps of Eng'rs*, 834 F.3d at 571–74.

[56] *Id.* at 574.

[57] 42 C.F.R. § 412.106(b)(4).

No. 18-60227

For the reasons below, we believe that § 412.106(b)'s requirements are clear. And where regulatory language is clear, we do not look beyond that language.[58]

The regulation describes the pool of qualifying hospital patient days. That pool includes not only those "days of service for which patients were eligible for Medicaid,"[59] but also days of service in which a patient "is eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2) . . . regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver."[60] It's important to point out that section (i) begins by explaining which patients are "deemed eligible for Medicaid" for the purpose of computing the Medicaid fraction. This phrase equates patient days involving Medicaid-eligible patients—days the previous paragraph expressly includes in the Medicaid fraction—with patient days involving patients who, while not strictly eligible for Medicaid, receive healthcare coverage under similarly comprehensive state-authorized plans (plans that include inpatient hospital service benefits).[61] Plus, when read as a whole, section (i) indicates that a patient's Medicaid eligibility "on a given day" is what's germane. That's what the fiscal intermediary has to figure out. What does *not* matter for purposes of this regulation is what the plan documents say about eligibility for particular services.

Just as we saw in the DSH adjustment statute, the word "eligible" is a crucial word in this regulation—this whole regulation is about how the fiscal intermediary determines who's "eligible for Medicaid" and, thus, counts

---

[58] *Copeland v. Comm'r*, 290 F.3d 326, 332–33 (5th Cir. 2002).

[59] 42 C.F.R. § 412.106(b)(4).

[60] *Id.* § 412.106(b)(4)(i).

[61] *Cf. Deem*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "deem" as "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have"); *HealthAlliance Hosps., Inc. v. Azar*, 346 F. Supp. 3d 43, 57 (D.D.C. 2018).

towards the Medicaid fraction's numerator.[62] Again, this is equivalent to figuring out who is "capable of receiving" something.[63] Likewise, the word "under," which plays a big role in the statutory text, does the same in the regulation: A qualifying patient must be "eligible for inpatient hospital services *under*" a state Medicaid plan or approved waiver.[64] Since the natural reading of "under" is "subject or pursuant to" or "by reason of the authority of,"[65] when the fiscal intermediary sits down to figure out which patients are deemed eligible for Medicaid on a given day (for purposes of the Medicaid fraction), the phrase "eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2)" plainly describes those individuals who were *capable* of receiving inpatient hospital services *pursuant to* the project the Secretary approved in the § 1115(a)(2) waiver.[66]

In short, the DSH adjustment regulation is unambiguous, meaning HHS is entitled to no *Auer* deference.

## B.    The Unambiguous DSH Adjustment Statute and Regulation Favor the Hospitals.

HHS spends almost 100% of its briefing explaining why the UCCP just wasn't part of a § 1115 demonstration project. First, HHS argues, its September and March letters to Mississippi demonstrate that the UCCP was entirely separate from the § 1115 demonstration project. Second, courts have consistently held that state-only general assistance days and charity care/uncompensated care days are not "eligible for medical assistance under a

---

[62] 42 C.F.R. § 412.106(b)(4).

[63] *See Covenant Health Sys.*, 820 F. Supp. 2d at 12; *accord Jewish Hosp., Inc.*, 19 F.3d at 274; *see also Eligible*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "eligible" as "[f]it and proper to be selected or to receive a benefit").

[64] 42 C.F.R. § 412.106(b)(4)(i) (emphasis added).

[65] *Ardestani*, 502 U.S. at 135 (cleaned up); *see also Under*, BLACK'S LAW DICTIONARY (10th ed. 2014) (remarking that "[t]he word 'under' has many dictionary definitions and must draw its meaning from its context").

[66] 42 C.F.R. § 412.106(b)(4)(i); *see also HealthAlliance*, 346 F. Supp. 3d at 58.

State plan approved under [Medicaid]."[67] The UCCP days are like those days; those days don't belong in the Medicaid fraction; therefore, UCCP days don't belong in the Medicaid fraction.

We disagree with both arguments. The UCCP was clearly part of the § 1115 project, and the cases HHS cites deal only with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)'s first phrase, not the following "regarded as such" phrase. Accordingly, they're easily distinguishable. Instead, we hold that this case's facts are more akin to those in *HealthAlliance Hospitals, Inc. v. Azar*, where the district court of Washington, D.C. held that patient days under the Massachusetts Commonwealth Care program counted towards the DSH numerator.[68]

### 1.   HHS's letters to Mississippi do not bolster HHS's case.

The fiscal intermediary must ascertain who's "eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2)."[69] But HHS's letters aren't the slam dunk it thinks they are. For instance, the district court focused on the words "[i]n addition" in the September letter. But this was simply the transition phrase the letter used as it went from discussing the Medicaid demonstration (Project Number 11–W–00197/4) and SCHIP demonstration (Project Number 21–W–00023/4) to discussing the UCCP. Plus, the very next paragraph—the paragraph immediately after the UCCP paragraph—begins: "Our approval of *this demonstration*," (singular) signaling that either (i) the UCCP is itself a demonstration or (ii) that the UCCP, Medicaid, and SCHIP programs together

---

[67] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); *see also Owensboro Health, Inc. v. U.S. Dep't of Health & Human Servs.*, 832 F.3d 615, 617 (6th Cir. 2016); *Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 848 (D.C. Cir. 2008); *see also Univ. of Wash. Med. Ctr.*, 634 F.3d at 1032; *Adena Reg'l Med. Ctr.*, 527 F.3d at 178–80.

[68] 346 F. Supp. 3d at 60–61.

[69] 42 C.F.R. § 412.106(b)(4)(i).

are considered to be a single demonstration. In any event, the letter's introductory phrase, "[i]n addition," doesn't show that the UCCP wasn't part of the approved demonstration project.

The district court also thought that because the Medicaid and SCHIP programs had different start and end dates than the UCCP, the UCCP was a separate undertaking that was totally distinct from the demonstration project. This was wrong. Each piece of a demonstration project doesn't have to work the same way or last for the same period of time. Indeed, given that each piece served a different function, it isn't surprising that they began and ended on different days.

The district court observed that the Secretary determined (as evidenced in the 2005 and 2006 letters) that individuals participating in the Medicaid expansion waiver "are presumed to be otherwise eligible for Medicaid or SCHIP in their respective home State," while no such presumptions were made about the UCCP folks. This simply isn't germane to the governing statute or regulation. The statutory and regulatory texts only care about whether patients underlying particular days were *in fact* eligible or *regarded as* eligible for Medicaid—there's no textually grounded reason to consider what patients were presumed to be otherwise eligible for.[70] The district court erred when it focused on counterfactual eligibility.

HHS also argues that it can exclude UCCP days from the Medicaid fraction's numerator because the statute says that "the Secretary *may*, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project."[71] This is true, but not quite on

---

[70] 42 C.F.R. § 412.106(b)(4)(i).
[71] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).

point. The Secretary *may* exercise discretion, and the Secretary *did* exercise that discretion when he authorized the UCCP in the 2005 and 2006 letters. But the hospitals' argument is more convincing: Once the Secretary authorizes a demonstration project, no take-backs. The statutory discretion isn't discretion to exclude populations that the Secretary has already authorized and approved for a given period; it's discretion to authorize the inclusion of those populations in the first place.

## 2.    Cases interpreting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) do not help HHS.

As mentioned above, HHS directs our attention to various cases dealing with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)'s phrase, "eligible for medical assistance under a State plan approved under [Medicaid]."[72] But these cases deal only with subsection (II)'s first phrase. They don't shed any light on subsection (II)'s second phrase, the phrase that governs this case: "patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project."[73] Since the cases HHS cites don't deal with programs authorized under a demonstration project, they're irrelevant to determining whether Mississippi's UCCP days belong in the Medicaid fraction's numerator.[74]

---

[72] *Owensboro*, 832 F.3d at 617–19 (passing no judgment on the post-DRA "regarded as such" phrase because "[t]he key dispute in this case is how to interpret the phrase 'eligible for medical assistance under a State plan approved under [Medicaid]'"); *Univ. of Wash. Med. Ctr.*, 634 F.3d at 1032 ("[t]his case turns on the meaning of the phrase 'eligible for medical assistance under a State plan approved under [Medicaid]'"); *Cookeville*, 531 F.3d at 847–48 (determining whether the Deficit Reduction Act of 2005 "constituted a valid retroactive change in the law" and holding that the first portion of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) excludes expansion waiver days); *Adena*, 527 F.3d at 178–80 ("[t]he question before us is whether HCAP patients are 'eligible for medical assistance under a State plan approved under [Medicaid]'").

[73] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

[74] *Univ. of Wash. Med. Ctr.*, 634 F.3d at 1032.

No. 18-60227

We do, however, find Judge Ketanji Brown Jackson's excellent opinion in *HealthAlliance Hospitals, Inc. v. Azar* extremely persuasive.[75] That opinion clearly and convincingly explains why the law governing the inclusion of § 1115 waiver patient days in the Medicaid fraction is straightforward: The plain regulatory text demands that such days be included—period.[76]

### 3.     Per clear statutory and regulatory directive, the UCCP days belong in the Medicaid fraction's numerator.

HHS argues that "no patient received benefits under the UCCP." This statement is mystifying. If UCCP patients didn't receive benefits under the UCCP, what *did* they receive? And under what or whose authority did they receive, well, whatever non-benefits they received? Medical assistance is a benefit.[77] And medical assistance is precisely what UCCP patients got. Plus, if the UCCP wasn't established under authority of a demonstration project, then by whose or what authority was it established? It certainly wasn't part of a typical "state plan" that followed the normal HHS approval process outlined in 42 U.S.C. § 1396a. HHS's theory—that the UCCP patients did not receive benefits under a § 1115 demonstration—offers no satisfactory answers to these questions.

This Hurricane Katrina demonstration project encompassed the UCCP. So, the only question the fiscal intermediary would need to answer when counting patient days associated with an approved demonstration project under the relevant DSH adjustment regulation is whether UCCP patients were capable of receiving inpatient health services. They were. Accordingly, the fiscal intermediary should've included UCCP days.

---

[75] 346 F. Supp. 3d 43.

[76] *Id.* at 60.

[77] *See Benefit*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "benefit" as any "advantage or privilege something gives; the helpful or useful effect something has").

No. 18-60227

## III. Conclusion

Generalist judges are not policy experts. That said, interpreting the laws under which Americans live is a quintessentially judicial function. And when legal texts are unambiguous, as these are, courts should stand firm and decide, not tiptoe lightly and defer.

For the reasons discussed above, we hold that HHS's decision to exclude UCCP patient days from the Medicaid fraction's numerator is "not in accordance with law."[78] Accordingly, we REVERSE and REMAND to the Medicaid Administrative Contractor to include the UCCP days in the hospitals' DSH adjustment.

---

[78] 5 U.S.C. § 706(2)(A).