*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

|  |  |
|---|---|
| KENTUCKY RIVERKEEPER, INC.; KENTUCKIANS FOR THE COMMONWEALTH, INC.; KENTUCKY WATERWAYS ALLIANCE, INC., <br>       *Plaintiffs-Appellants*, <br><br>    *v.* <br><br> ROBERT A. ROWLETTE, JR., et al., <br>       *Defendants*, <br><br> CARL A. STROCK, Lieutenant General, Chief of Engineers and Commander of the U.S. Army Corps of Engineers; RAYMOND G. MIDKIFF, Colonel, District Engineer, U.S. Army Corps of Engineers, Louisville District; DANA R. HURST, Colonel, District Engineer, U.S. Army Corps of Engineers, Huntington District; STEVEN J. ROEHMHILDT, Colonel, District Engineer, U.S. Army Corps of Engineers, Nashville District, <br>       *Defendants-Appellees*. | No. 11-6083 |

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 7:05-cv-181—David L. Bunning, District Judge.

Argued: October 4, 2012

Decided and Filed: April 22, 2013

Before: SILER and COOK, Circuit Judges; STEEH, District Judge.[*]

_____

[*] The Honorable George C. Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**COUNSEL**

**ARGUED:** James M. Hecker, PUBLIC JUSTICE, Washington, D.C., for Appellants. Tamara N. Rountree, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** James M. Hecker, PUBLIC JUSTICE, Washington, D.C., Stephen A. Sanders, APPALACHIAN CITIZENS LAW CENTER, Whitesburg, Kentucky, Joseph M. Lovett, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Appellants. Tamara N. Rountree, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

**OPINION**

---

COOK, Circuit Judge.    Plaintiffs-Appellants Kentucky Riverkeeper, Inc., Kentucky Waterways Alliance, Inc., and Kentuckians for the Commonwealth, Inc. (collectively "Riverkeeper") sued the Army Corps of Engineers alleging violations of the Clean Water Act (CWA), 33 U.S.C. § 1344(e), the National Environmental Protection Act (NEPA), 42 U.S.C. § 4332(2)(C), and the Administrative Procedure Act (APA), 5 U.S.C. § 706, during the Corps' issuance of two nationwide coal-mining waste-discharge permits in 2007.  The district court granted summary judgment to the Corps, and Riverkeeper appeals.  During Riverkeeper's appeal, the two permits at issue expired.  For the following reasons, the case remains in controversy and we REVERSE the district court's judgment in part.

I.

*A.  The Nationwide Permits: NWP 21 and NWP 50*

The Clean Water Act requires the Army Corps of Engineers to issue permits for mining activities that discharge dredged or fill material into United States waterways. 33 U.S.C. § 1344.  The Corps engages in two permitting options, each different in scope. It issues either individual permits that allow an individual applicant's project to proceed or general permits that authorize a specific category of activities on a state, regional, or nationwide basis.  For activities covered by a general permit, operators may forgo the

more burdensome process for obtaining an individual permit and instead seek authorization under the general permit. *See Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 503 (4th Cir. 2005) ("The process for obtaining authorization under a general permit . . . is significantly more expeditious than the process for obtaining an individual permit under section 404(a)."). The Corps issues a general permit only if the regulated activities are similar in nature, will "cause only minimal adverse environmental effects when performed separately," and will cause "only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

In 2007, the Corps issued two nationwide general permits (hereinafter the "nationwide permits"): permit 21 and permit 50. Permit 21 authorized surface coal-mining operations to discharge dredged and fill material into waters of the United States (i.e., streams); permit 50 allowed underground coal-mining operations to do the same. Before issuing each permit, the Corps conducted a public notice-and-comment period and completed required environmental analyses, including a cumulative-impacts analysis. Each cumulative-impacts analysis projected the permits' respective environmental impacts before determining that compensatory mitigation would reduce adverse impacts to a minimal level. The Corps disclosed its analyses and findings in each nationwide permit's Environmental Assessment (hereinafter "the Assessment(s)"), prepared for NEPA purposes in lieu of an environmental impact statement. The nationwide permits became effective on March 19, 2007.

Projects seeking authorization under the nationwide permits faced two additional layers of Corps oversight. First, a proposal needed to pass muster under any regional "public interest" requirements imposed by the Corps' division engineers in their discretion. 33 C.F.R. § 330.5(c)(1). Second, the Corps' local district engineers had to approve a project's pre-construction notification. *Id*. § 330.5(c)(2). A district engineer could authorize or suspend projects, or impose project-specific special conditions to ensure that the project has only minimal cumulative net impacts. *See id.* § 330.5(d).

The nationwide permits expired on March 18, 2012, but the Corps extended the permits until March 18, 2013 for projects started before the 2012 expiration date. 77 Fed. Reg. 10,184, 10,184 (Feb. 21, 2012). Additionally, in order to "provide an equitable and less burdensome transition" and avoid a "significant hardship" for coal operators, *id.* at 10,209, the Corps granted a five-year accommodation (until 2017) to activities authorized under permit 21 "without applying the new limits imposed [by 2012 amendments to the permit]," *id.* at 10,184. The Corps estimates that approximately 70 surface coal-mining activities authorized under permit 21 qualify for this five-year reauthorization. *Id.* at 10,209.

## B. District Court Proceedings

Riverkeeper sued the Corps, alleging that the cumulative-impacts analyses prepared for the Assessments authorizing the nationwide permits violated the CWA, NEPA, and the APA.[1] Riverkeeper advanced two primary challenges to the permits' Assessments: (1) that the Corps bypassed a necessary NEPA consideration, the present effects of past permit authorizations, *see* 40 C.F.R. § 1508.7–.9; and (2) that the Corps failed—in violation of the CWA, NEPA, and the APA—to properly explain how compensatory mitigation would ensure cumulatively minimal impacts. *See Ky. Riverkeeper, Inc. v. Midkiff*, 800 F. Supp. 2d 846 (E.D. Ky. 2011). In making these arguments, Riverkeeper relied on a district court decision from West Virginia, *Ohio Valley Environmental Coalition v. Hurst*, 604 F. Supp. 2d 860 (S.D. W. Va. 2009), that

---

[1]Kentucky Riverkeeper, Inc., Kentucky Waterways Alliance, Inc., and Kentuckians for the Commonwealth, Inc. collectively challenged nationwide permits 21, 49, and 50 (2007). The district court held that each plaintiff lacked standing to challenge permit 49, and the parties did not appeal this ruling. The court determined that Kentucky Waterways Alliance and Kentuckians for the Commonwealth—but not Kentucky Riverkeeper—could pursue their claims against permits 21 and 50 because "prior authorizations remain effective and filling activities can continue under those authorizations until March 2013." *Ky. Riverkeeper, Inc.* v. *Midkiff*, 800 F. Supp. 2d 846, 859–60, 863 (E.D. Ky. 2011).

Appellants argue that the court erred in dismissing Kentucky Riverkeeper, Inc. from the litigation below. The Corps does not defend Kentucky Riverkeeper, Inc.'s dismissal. (Appellee Br. at 2 n.2.) Yet, because the district court found that Kentucky Waterways Alliance, Inc. and Kentuckians for the Commonwealth, Inc. have standing, we need not inquire whether Kentucky Riverkeeper, Inc. also had standing. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 431 n.19 (1998); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 n.1 (6th Cir. 2004) ("[I]n a facial challenge such as this where one party has standing, we need not consider the issue of standing of other parties to the action.").

invalidated permit 21 "for the very same reasons." *Ky. Riverkeeper*, 800 F. Supp. 2d at 865.

The district court rejected *Hurst*'s reasoning and granted summary judgment to the Corps, finding that the Corps adequately reviewed the present effects of past nationwide permit authorizations and properly relied on compensatory mitigation to ensure minimal cumulative impacts. Riverkeeper timely appeals, advancing the same arguments presented to the district court. We have jurisdiction under 28 U.S.C. § 1291.

II.

Before we consider the merits of Riverkeeper's claims, we address the Corps' argument that the nationwide permits' expiration renders Riverkeeper's claims moot.

"It is a basic principle of Article III that a justiciable case or controversy must remain extant at all stages of review, not merely at the time the complaint is filed." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1335 (2013). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party," *id.*, and a change in circumstances that renders a court unable to grant petitioners meaningful relief may prudentially moot an action, *see Greenbaum v. EPA*, 370 F.3d 527, 534–35 (6th Cir. 2004). The Corps argues that the March 18, 2012 expiration of the nationwide permits prudentially moots Riverkeeper's appeal. But when an expired permit's conditions remain in effect, so too does the case and controversy. In *Kescoli v. Babbitt*, the Ninth Circuit distinguished challenges to agency action that "had already begun and ended" from challenges where the issuance of a renewal permit sustains the controversy. 101 F.3d 1304, 1309 (9th Cir. 1996). If "the same [challenged] condition [remains] in effect and continues to govern [defendant's] coal mining operations[,] . . . [t]he same controversy exists after the issuance of the renewal permit." *Id.*

Though the permits here expired, the Corps grandfathered mining activities authorized by permit 21 for five years, allowing project reauthorization "without applying the new limits imposed on [2012 permit 21]." 77 Fed. Reg. at 10,184 (titled

"Grandfather Provision for Expiring NWPs").  These reauthorizations, effective until 2017, allow projects authorized in reliance on permit 21's challenged cumulative-impacts analysis to evade considerably tighter restrictions on surface coal mining.  *See id.*  It matters not that "the 2012 versions of [permits] 21 and 50 are significantly different from the [permits] challenged here" (Appellee Br. at 29), because the Corps incorporated permit 21 into its 2012 amended form and therefore extended its reliance on the challenged cumulative-impacts analysis.  *See Kescoli*, 101 F.3d at 1309.

We do not consider Riverkeeper's challenges to permit 50, however, because projects authorized under permit 50 were extended only for one year, until March 18, 2013.  77 Fed. Reg. at 10,184.  Because the Corps no longer relies on that now-expired permit's challenged cumulative-impacts analysis, we analyze only the live controversy concerning projects reauthorized under permit 21.

III.

*A.  Standard of Review*

We review the district court's summary judgment rulings de novo and the Corps' permitting decisions under the APA's arbitrary and capricious standard.  *Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 473 (6th Cir. 2008).  Summary judgment is proper if the record shows that no genuine dispute exists as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  An agency's decision is arbitrary and capricious when the agency has:

> relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

"Judicial review of NEPA compliance is limited in scope." *Cmtys., Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir. 1992). We "ensure that the agency has adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*, 462 U.S. 87, 97–98 (1983); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (explaining that NEPA "does not mandate particular results, but simply prescribes the necessary process"). In reviewing challenges to NEPA compliance, we give "substantial deference" to the regulations promulgated by the Council on Environmental Quality (CEQ), the federal agency established to fill in the gaps of NEPA's regulatory scheme. *Marsh v. Or. Natural Res. Def. Council*, 490 U.S. 360, 372 (1989).

## B. The NEPA Regulations & The Cumulative Impact of Past Actions

NEPA employs a "set of 'action-forcing' procedures that require agencies to take a 'hard look at environmental consequences.'" *Robertson*, 490 U.S. at 350 (internal quotation marks omitted) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). One of these action-forcing procedures requires federal agencies to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). To spare agencies the hardship of conducting exhaustive review of every NWP proposal's environmental impact, CEQ authorized agencies to first prepare a less burdensome environmental assessment as a method for determining whether a proposal needed an environmental impact statement. *See* 40 C.F.R. § 1508.9. The Corps did that here, deeming an EIS unnecessary. Though less demanding than an environmental impact statement, an environmental assessment still required the authorizing agency to consider the environmental impacts of its proposals. *See id.* § 1508.9(b); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F. 3d 1172, 1215 (9th Cir. 2008) (explaining that environmental assessments "need not conform to all the requirements" of an environmental impact statement) (internal quotation marks omitted).

The NEPA regulations provide that environmental assessments "[s]hall include brief discussions of the . . . environmental impacts of the proposed action and alternatives," 40 C.F.R. § 1508.9(b), including "cumulative impact," *see id.* § 1508.7–.8.[2] Cumulative impact refers to "the impact on the environment which results from the incremental impact of the [proposed] action when added to other past, present, and reasonably foreseeable future actions." Id. § 1508.7.

The Corps concedes that these regulations required it to assess the impact of past actions, but cites a CEQ advisory memorandum for the proposition that it could satisfy this obligation by considering past actions' impact "in the aggregate." (Appellee Br. at 31–32 (citing Council on Environmental Quality, Guidance on the Consideration of Past Actions in Cumulative Effects Analysis (2005) [hereinafter "Guidance"] at 2–3, *available at* http://energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-PastAct sCumulEffects.pdf).) The Ninth Circuit has already adopted this view from the Guidance, *see League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1217 (9th Cir. 2008), and we have no qualms agreeing. The Corps' argument runs aground, however, because the Assessment failed to identify any impact—aggregate or otherwise—of past actions.

Not so, says the Corps, because the Assessment reflects its consideration of the "national environmental baseline," a term it uses to refer to a compilation of statistical surveys regarding available aquatic natural resources throughout the United States. Indeed, pages 12 to 17 of the Assessment include portions of various national surveys in discussing available resources, but the Assessment's discussion of these surveys makes no mention of the *impact* of prior actions. In fact, section 4.0 of the Assessment, titled "Environmental Consequences," expressly disclaims consideration of past impacts: "Only the reasonably foreseeable direct or indirect effects [of the proposed nationwide

---

[2]The NEPA regulations synonymously use the words "impacts" and "effects." "Effects" encompass a variety of factors, including "ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

permit] are included in the environmental assessment." (NWP 21 Decision Doc. at 20.)[3] Given this statement, we may not infer that surveys discussing the *availability* of national resources reflect the Corps' consideration of the cumulative impact of past actions. This "baseline" argument also comes as a surprise because, as Riverkeeper points out, the Corps did not so argue before the district court in *Hurst*. Rather, it appears that the Corps defended permit 21's Assessment in that case by categorically denying that the NEPA regulations required consideration of past impacts. *Hurst*, 604 F. Supp. 2d at 885–86 & n.19 (rejecting the Corps' conclusory argument that past activities authorized under permit 21 have no bearing on its cumulative-impact analysis).

The Corps provides a nonresponsive argument with its three-tier review process for individual activities seeking approval under permit 21. The Corps notes that its divisions and districts will add regional conditions that enhance environmental protections and address local concerns. It maintains that its division engineers "consider . . . the present effects of past actions in greater detail than is possible for the nationwide analysis." But these additional assessments occur *after* the reauthorization of the nationwide permit—itself an alternative to an individual permitting system—and therefore presume that the Assessment satisfied the NEPA regulations' prerequisites for reauthorization. Though the Corps argues that "the nationwide level of review is only the preliminary stage" of review, it acknowledges that the relevant NEPA regulations, 40 C.F.R. § 1508.7–.9, mandate that the Assessment include a cumulative-impact analysis encompassing a review of past impacts. (Appellee Br. at 31–32.)

Despite conceding its obligation under the NEPA regulations to consider past impacts in the aggregate (Appellee Br. at 39–40), the Corps appears to read the CEQ Guidance as overriding the § 1508.7 requirement to consider past impacts. *Cf.* 40 C.F.R. § 1508.7 (defining "cumulative impact" as "the impact on the environment which results from the incremental impact of the [proposed] action *when added to other past*, present, and reasonably foreseeable future actions." (emphasis added)). Yet, the Corps offers no

---

[3]Matching this exclusionary language, the same section of the Assessment states that "[t]he *following* evaluation comprises the NEPA analysis," thereby omitting the prior sections' discussion of available resources. (NWP 21 Decision Doc. at 19 (emphasis added).)

authority that allows an interpretive guidance to work such a substantive change to a duly promulgated regulation.

The Guidance itself belies such a narrow reading. Issued by CEQ's Chairman in 2005, it states in pertinent part:

> The environmental analysis required under NEPA is forward-looking, in that it focuses on the potential impacts of the proposed action that an agency is considering. Thus, review of past actions is required to the extent that this review informs agency decisionmaking regarding the proposed action. This can occur in two ways:
>
> First, the effects of past actions may warrant consideration in the analysis of the cumulative effects of a proposal for agency action. CEQ interprets NEPA and CEQ's NEPA regulations on cumulative effects as requiring analysis and a concise description of the identifiable present effects of past actions to the extent that they are relevant and useful in analyzing whether the reasonably foreseeable effects of the agency proposal for action and its alternatives may have a continuing, additive and significant relationship to those effects. In determining what information is necessary for a cumulative effects analysis, agencies should use scoping to focus on the extent to which information is "relevant to reasonably foreseeable significant adverse impacts," is "essential to a reasoned choice among alternatives," and can be obtained without exorbitant cost. 40 CFR 1502.22. Based on scoping, agencies have discretion to determine whether, and to what extent, information about the specific nature, design, or present effects of a past action is useful for the agency's analysis of the effects of a proposal for agency action and its reasonable alternatives.
>
> Agencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effect of all past actions combined. Agencies retain substantial discretion as to the extent of such inquiry and the appropriate level of explanation. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376–77 (1989). Generally, agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions.
>
> Second, experience with and information about past direct and indirect effects of individual past actions may also be useful in illuminating or predicting the direct and indirect effects of a proposed action. However, these effects of past actions may have no cumulative relationship to the effects of the proposed action. Therefore, agencies should clearly distinguish analysis of direct and indirect effects based on

information about past actions from a cumulative effects analysis of past actions.

Guidance at 1–2.

In our view, two aspects stand out. First, though reviewing agencies retain considerable discretion to determine the "scop[e]" and "relevan[ce]" of past actions, and may "focus[] on the current aggregate effects of past actions without delving into . . . individual past actions," this discretion coincides with their obligation to provide "a concise description of the identifiable present effects of past actions to the extent that they are relevant and useful in analyzing whether the reasonably foreseeable effects of the agency proposal for action and its alternatives may have a continuing, *additive* and significant relationship to *those* effects." *Id.* at 1 (emphasis added). An environmental assessment that omits consideration of past impacts, followed by a conclusory suggestion that past impacts did not matter, cannot be in conformance. This is especially true where the reviewing agency *reauthorizes* a nationwide permit involving the same type of mining activities that cause the same type of environmental impacts. Second, the Guidance instructs the reviewing agency to "distinguish" the use of past impacts to forecast future impacts *from* the use of past impacts to assess cumulative impacts.

The Corps did not do this. It used past impacts to forecast future impacts, but not to assess cumulative impacts. While taking advantage of the more lenient environmental-assessment method (instead of the intensive environmental-impact-statement method), the Corps short-circuited the "cumulative impact" analysis by confining its review to an estimate of future impacts. The Corps reasonably relied on data regarding past impacts to project future impacts, but it failed to combine the two to gauge the *cumulative* impact of reauthorizing permit 21. Its Assessment offered no explanation for this shortcoming. Such limited review not only avoids the NEPA regulation's definition of "cumulative impact," but also the ordinary meaning of "cumulative." *See Webster's II New College Dictionary* 275 (2d ed. 2001) (defining "cumulative" as "[e]nlarging or increasing by successive addition").

The Corps directs us to its final decision reissuing permit 21. *See* 72 Fed. Reg. 11,092 (Mar. 12, 2007). There, the Corps responded to objections that the Assessment neglected past-impacts analysis, *id.* at 11,094–96, by (i) invoking the CEQ Guidance's instruction "that agencies look at the present effects of past actions that are relevant because of significant cause-and-effect relationships with the effects for the proposed action," and (ii) explaining that, because nationwide permits rarely authorize "activities of a continuing nature . . . [t]he cumulative effects analysis is more properly focused on the permits that can be used to authorize regulated activities, not past permits that have expired." *Id.* at 11,096. Thus, it would seem, the Corps deemed past-impacts analysis *irrelevant* to a determination of cumulative impact—the same position it took in the *Hurst* litigation. But the Corps fails to explain how prior similar mining projects authorized under the same permit have no environmental impact, such that a cumulative-impact analysis should properly exclude them. As the *Hurst* court explained, "Even if the individual projects (i.e. the dredging and filling) authorized under past [versions of permit 21] were complete, the regulations require the Corps to assess the '*present effects* of past actions.' Whether the project is complete has no bearing on whether that project results in present effects to the environment." *Hurst*, 604 F. Supp. 2d at 885–86 (citing Guidance at 1).

The district court recognized that the Corps "did not provide a detailed explanation for its belief that [past permit 21 activities] would not have a continuing effect," but excused this because the "Corps' path can reasonably be discerned." *Ky. Riverkeeper*, 800 F. Supp. 2d at 868 (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The district court primarily relied on the Corps' final-decision statements, as well as the Corps' assurance that compensatory mitigation would offset past environmental impacts. *Id.* at 867–69. These justifications do not satisfy the Corps' obligation to include a cumulative-impact analysis where the Assessment completely neglects past impacts from that calculus.

In simultaneously arguing that it did and did not need to consider past impacts (Appellee Br. at 31–32 vs. final-decision statements and *Hurst* position), and that it did

and did not do so (the "baseline" argument vs. the final-decision statements), the Corps stakes no position. This much is clear from the administrative record: the Assessment omitted the present effects of past actions from its cumulative-impact analysis, as required by 40 C.F.R. § 1508.7, and its conclusory final-decision statements do not cure this defect. Though we conduct "limited" NEPA review, *Cmtys., Inc.*, 956 F.2d at 623, we have a duty to set aside the Corps' action when it eschews its NEPA obligation to "adequately consider[] and disclose[] the environmental impact of its actions." *Balt. Gas & Elec. Co.*, 462 U.S. at 97–98. Because the Assessment failed to comply with the NEPA regulations' requirements, we set aside the Corps' reauthorization of permit 21 as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43 (reviewing agency action to "consider whether the decision was based on a consideration of the relevant factors"); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416–17 (1971) (same).

*C. Permit 21's Reliance on Compensatory Mitigation*

We find similarly troubling the Corps' defense to Riverkeeper's compensatory-mitigation claims under the CWA and NEPA. Citing CWA regulations, Riverkeeper specifically faults the Corps' failure to provide "analysis or documentation" for the Assessment's determination that compensatory mitigation will ensure cumulatively minimal adverse effects. (Appellant Br. at 27–28 (citing 40 C.F.R. §§ 230.7(b), 230.11).) Though the Corps disputes its failure to provide an explanation for its decision, it offers no response to Riverkeeper's no-documentation charge.

Under the CWA, the issuance of a nationwide permit hinges on the reviewing agency's finding that a proposal has only a "minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1); *see also* 40 C.F.R. § 230.7(a)(3). In making this finding, the relevant CWA regulations require an agency to (i) "set forth in writing an evaluation of the potential . . . cumulative impacts of the category of activities to be regulated" by the proposal, 40 C.F.R. § 230.7(b), and (ii) provide "*documented information* supporting each factual determination [required by § 230.11]," *id.*

§ 230.7(b)(1) (emphasis added), including a determination of cumulative impacts, *id.* § 230.11(g).[4] The Corps, in reauthorizing permit 21, made the following factual finding:

> Using the current trend, approximately 1,085 activities could be authorized over a five year period until [permit 21] expires, resulting in impacts to approximately 320 acres of waters of the United States, including jurisdictional wetlands. Approximately 540 acres of compensatory mitigation would be required to offset those impacts. The required compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by [permit 21] will be minimal.

(NWP 21 Decision Doc. at 22.) Absent from this discussion is *any* mention of the Corps' factual underpinnings for this determination. Both in its briefing and at oral argument, the Corps relied on its procedures overseeing individual projects' success in mitigating environmental impacts. (Appellee Br. at 52–53; Oral Arg. at 30:40–32:36.)[5] Yet these post-issuance mechanisms do not explain how the Corps arrived at its *pre-issuance* minimal cumulative-impact findings. The Corps fails to make this showing despite *Hurst*'s earlier adverse decision on the point. *See Hurst*, 604 F. Supp. 2d at 887 (deeming "conclusory" the Corps' "unsupported belief in the success of mitigation measures" and explaining that the Corps' "'mere listing' of mitigation measures and processes, without any analysis, cannot support a cumulative impacts determination").

Citing our decision in *Sierra Club v. Slater*, 120 F.3d 623, 636 (6th Cir. 1997), the district court noted that "it is not necessary to have a final, detailed mitigation plan prior to the issuance of [nationwide permit]," and held that a "permit conditioned on the future implementation of a mitigation plan complies with the requirements of the CWA."

---

[4] Riverkeeper appears to acknowledge that the NEPA regulations do not require the same documentation, but asserts that the baseline APA procedures impose a similar requirement. Because the CWA regulations provide a direct path for resolution, we need not reach this part of Riverkeeper's challenge.

[5] Specifically, the Corps relies on the Eastern Kentucky Stream Assessment Protocol as an "objective, scientific methodology" used "to assess the appropriate quantity and quality mitigation [sic] and assist the Corps in ensuring" minimal environmental impacts. While this tool conceivably *could* have supported a specific mitigation finding in its determination of minimal cumulative impacts, it did not do so here. The Corps admits that its use of the Protocol in permit 21's Supplemental Decision Document extended no further than prospectively requiring individual Kentucky-based projects to "ensure minimal impacts." (Appellee Br. at 18; *see also* NWP 21 Supp. Decision Doc. at 2.)

*Ky. Riverkeeper*, 800 F. Supp. 2d at 876; *see also Bulen*, 429 F.3d at 502 ("[S]ection 404(e) does not unambiguously forbid the Corps from making the minimal-environmental-impact determinations by relying in part on the availability of post-issuance procedures, and such reliance is a reasonable way for the Corps to ensure that the projects it authorizes under general permits will have only minimal impacts."). No quarrel there, but *Sierra Club* did not involve the same issue. Whereas the plaintiffs in *Sierra Club* advanced a broader challenge that the "[CWA] permit was invalid because the Corps did not previously prepare a final, detailed mitigation implementation plan," 120 F.3d at 636, Riverkeeper specifically challenges the Corps' compliance with 40 C.F.R. § 230.7(b)'s documentation requirement in making its minimal cumulative-impacts findings. In other words, Riverkeeper does not dispute that the Corps *can* rely on mitigation; rather, it contests the Corps' failure to "provid[e] any explanation or documentation to support th[e] presumption" that compensatory mitigation will ensure minimal cumulative effects. Further, the Corps' "quite specific" mitigation plan in *Sierra Club* belied the plaintiffs' assertion of "vague mitigation goals." 120 F.3d at 636. Tellingly, the Corps does not rely on *Sierra Club*, *Bulen*, or this feature of the district court's decision.

We acknowledge that the Corps may rely on post-issuance mitigation procedures to minimize environmental impacts, but in making a minimal-cumulative-impact finding, it must, at a minimum, provide *some* documented information supporting that finding. 40 C.F.R. §§ 230.7(a)–(b), 230.11(g).

*D. Conclusion*

Though we generally give greatest deference to an agency's "complex scientific determination[s] within its area of special expertise," *Balt. Gas & Elec. Co.,* 462 U.S. at 103, we may not excuse an agency's failure to follow the procedures required by duly promulgated regulations, *see, e.g.*, *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43. During oral argument, the Corps repeatedly objected to the feasibility of Riverkeeper's demands. This policy argument misses the point. After opting for streamlined nationwide permitting, the Corps took the easier path of preparing an environmental assessment

instead of an environmental impact statement. Having done so, it needed to follow the applicable CWA and NEPA regulations by documenting its assessment of environmental impacts and examining past impacts, respectively. Failing these regulatory prerequisites, the Corps leaves us with nothing more than its say-so that it meets CWA and NEPA standards. We may not supply a reasoned basis for the agency's action that the agency itself has not given. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

We hereby invalidate permit 21 as arbitrary and capricious, 5 U.S.C. § 706(2)(A), but stay this ruling for 60 days to allow the parties and the district court an opportunity to assess the ramifications of this ruling on existing projects and potential remedies.

IV.

We REVERSE and REMAND for further proceedings consistent with this opinion. We STAY this ruling for 60 days as explained.