The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>February 11, 2025</u>

**No. A-1-CA-40030**

**SOUTHWEST RESEARCH AND INFORMATION CENTER, CYNTHIA WEEHLER, and CONCERNED CITIZENS FOR NUCLEAR SAFETY,**

Appellants,

v.

**SECRETARY OF NEW MEXICO ENVIRONMENT DEPARTMENT,**

Appellee,

and

**UNITED STATES o/b/o UNITED STATES DEPARTMENT OF ENERGY; and SALADO ISOLATION MINING CONTRACTORS, LLC, as current co-permittee in substitution of Nuclear Waste Partnership, LLC,**

Intervenors-Appellees,

**IN THE MATTER OF NEW MEXICO ENVIRONMENT DEPARTMENT HEARING DETERMINATION REQUEST CLASS 3 "EXCAVATION OF A NEW SHAFT AND ASSOCIATED CONNECTING DRIFTS" PERMIT MODIFICATION TO THE WIPP HAZARDOUS WASTE FACILITY PERMIT.**

**APPEAL FROM THE OFFICE OF THE SECRETARY OF ENVIRONMENT**
**JAMES C. KENNEY, Secretary of Environment**

Lindsay A. Lovejoy, Jr.
Santa Fe, NM

Joni Arends
Santa Fe, NM

for Appellants

Christal Weatherly, Special Assistant Attorney General
Assistant General Counsel
Albuquerque, NM

for Appellee

Hance Scarborough, LLP
Michael L. Woodward
Austin, TX

Gallagher & Kennedy
Dalva L. Moellenberg
Santa Fe, NM

for Salado Isolation Mining Contractors, LLC

United States Department of Justice
Environment and Natural Resources Division
Environment Defense Section
Fred J. Federici, Acting United States Attorney
Alexander M.M. Uballez
Heather Gange
Sarah Izfar
Washington, D.C.

Cassandra C. Curie, Assistant United States Attorney

Albuquerque, NM

for Intervenors-Appellees

## OPINION

**YOHALEM, Judge.**

{1}      Southwest Research and Information Center, Cynthia Weehler, Concerned Citizens for Nuclear Safety (CCNS), and Deborah Reade (collectively, SW Research) appeal the New Mexico Environment Department's (NMED) final order granting the United States Department of Energy's (DOE) and Salado Isolation Mining Contractors, LLC's (Salado) (collectively, Permittees[1]) request for a modification of the Waste Isolation Pilot Plant's (WIPP) operating permit to allow modifications to the ventilation system at the WIPP facility. The PMR sought approval of the excavation and construction of a fifth vertical ventilation shaft and associated horizontal tunnels (drifts), a major, Class 3, change to the WIPP facility and its operations from the original plan. *See* 40 C.F.R. § 270.42(d)(2)(iii) (2017)[2] (defining Class 3 modifications as changes that "substantially alter the facility or its operation"). A PMR for a Class 3 modification is granted under the applicable federal and state hazardous waste regulations governing WIPP only upon a showing of need for modification of the facility or its operation, supported by credible

---

[1]At the time the Permit Modification Request (PMR) was submitted, the Permittees were DOE and Nuclear Waste Partnership, LLC (NWP). Salado, the current co-permittee with DOE, was subsequently substituted for NWP.

[2]Regulation 20.4.1.900 NMAC incorporates 40 C.F.R. pt. 270 by reference. We cite to the federal regulations directly in this opinion and do not include in the citation the New Mexico regulation incorporating the federal regulations.

technical, and nontechnical evidence at an adversarial hearing where interested organizations and members of the public are invited to present evidence, and to cross-examine the Permittees' witnesses. 20.4.1.901(F) NMAC. Following an adjudicatory hearing, the hearing officer found that the PMR was needed, in relevant part, to (1) allow authorized operations to be carried out efficiently after a 2014-radiological event limited WIPP's ventilation capabilities, and (2) protect WIPP workers and the environment during the ongoing authorized operation of WIPP. NMED granted the PMR, adopting the hearing officer's findings, conclusions, and recommendations. SW Research appeals, challenging NMED's finding that the fifth ventilation shaft is needed to complete already authorized operations at WIPP. SW Research argues that the cost of constructing a fifth ventilation shaft can be justified only under the assumption that WIPP will be expanded far beyond its congressionally approved size, period of operation, and type of waste. In addition to challenging the evidence of current need for the PMR, SW Research objects to the hearing officer's exclusion of evidence concerning upcoming requests for WIPP expansion, and the hearing officer's conclusion that there was sufficient public notice throughout the PMR process. Finding no error, we affirm.

**BACKGROUND**

{2}     Hazardous materials, which are defined to include the mixed transuranic waste deposited at WIPP, are regulated by NMED pursuant to a federal grant of

2

authority by 42 U.S.C. § 6926(b) of the Resource Conservation and Recovery Act (RCRA), allowing the State to implement a hazardous waste program "equivalent to" the federal RCRA requirements. New Mexico implemented the permission granted by the RCRA by enacting the New Mexico Hazardous Waste Act (HWA), NMSA 1978, §§ 74-4-1 to -14 (1977, as amended through 2021). The HWA authorized NMED to regulate WIPP, including issuing permits regarding the operation of WIPP and the storage of hazardous waste at the WIPP site. *See* § 74-4-5.

{3}     Although NMED has authority to issue permits and permit modifications concerning both the physical facility and the operation of WIPP, WIPP's waste disposal capacity was established by the federal government in the Waste Isolation Pilot Plant Land Withdrawal Act of 1992 (LWA), Pub. L. No. 102-579, 106 Stat. 4777 (1992), as amended by Pub. L. No. 104-201, 110 Stat. 2422 (1996). The LWA authorizes 6.2 million cubic feet of transuranic waste to be stored at WIPP. Pub. L. No. 104-201, § 7(a)(3). The storage capacity of WIPP is not subject to expansion by NMED without Congressional authorization.

{4}     Permits to operate the WIPP facility are generally issued or renewed by NMED every ten years. *See* 40 C.F.R. § 270.50(a). During that ten-year period, "a permit may be modified at the request of the permittee for just cause as demonstrated by the permittee." Section 74-4-4.2(G)(2). NMED regulations divide permit modification requests into three classes. A Class 3 PMR, defined as any proposed

3

modification that "substantially alter[s] the facility or its operation," 40 C.F.R. § 270.42(d)(2)(iii), requires the permittee to "[d]escribe[] the exact change[s] to be made to the permit condition" and "[e]xplain[] why the modification is needed." 40 C.F.R. § 270.42(c)(1)(i), (iii). A Class 3 PMR also requires that the permittee and NMED comply with public notice requirements at each stage of the PMR process, and provide an opportunity for a public hearing. *See* § 74-4-4.2(H). "A public hearing is an adversarial proceeding held before a hearing officer." *Sw. Rsch. & Info. Ctr. v. N.M. Env't Dep't*, 2014-NMCA-098, ¶ 16, 336 P.3d 404 (citing 20.4.1.901(F) NMAC). The scope of a public hearing on a PMR is limited to the permit provision being modified. *See* 20.4.1.901(B)(7) NMAC. The hearing officer's report must contain findings of fact, conclusions of law, recommendations, and a proposed final order. *See* 20.1.5.500(C)(1) NMAC. The Secretary of NMED then issues a final written order, which either adopts, modifies, or sets aside the hearing officer's findings, conclusions, and recommendations. *See* 20.1.5.500(D)(1) NMAC. The Secretary's order can be appealed to this Court. *See* § 74-4-14(A).

{5}      In this case, the Secretary of NMED adopted the hearing officer's findings, conclusions, and recommendation to approve the PMR. SW Research appealed to this Court. We review the facts relevant to each issue in our discussion of that issue.

# DISCUSSION

## I.      Motion to Dismiss as Moot

{6}      Before discussing the merits of this appeal, we address Permittees' motion to dismiss the appeal as moot. Permittees argue that this appeal is moot "because NMED has taken a superseding administrative action and, consequently, this Court can no longer grant the relief requested by [SW Research]." The "superseding administrative action" referred to by Permittees is the expiration of the ten-year operating permit granted to Permittees by NMED in 2010, as modified by the PMR at issue in this appeal, and the renewal of that permit for another ten-year period. Permittees argue that the new ten-year renewal permit, issued well after this appeal was filed and briefed, supersedes NMED's final order granting the PMR for the fifth shaft, and, therefore, even if this Court reverses the final order, the Court could no longer require NMED to cease construction of the new fifth shaft and ventilation system or cease operating that system, if construction had been completed. We do not agree.

{7}      There is no dispute that the renewal permit left in place the terms of the final order granting the PMR. The terms of the final order had been incorporated into the expired permit, and were not changed by NMED in renewing that permit; the renewal permit continues to include the authorization for the excavation, construction and operation of the fifth ventilation shaft and accompanying drifts at

5

issue in this appeal. Although twenty-five modifications to the renewal permit were proposed by NMED, none of these affected the construction of the fifth ventilation shaft at issue in this appeal.[3]

{8} "A case is moot when no actual controversy exists, and the court cannot grant actual relief." *Gunaji v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008 (internal quotation marks and citations omitted). Permittees' contention is that an order of this Court could no longer be enforced, and that, therefore, no actual relief can be granted because a renewal permit, albeit with the very same terms, has been adopted by NMED. While there is no New Mexico case law directly on point, other jurisdictions have rejected this argument, holding that an appeal of an expired permit is not moot if the "same condition is still in effect and . . . [t]he same controversy exists after the issuance of the renewal permit." *Kescoli v. Babbitt*, 101 F.3d 1304, 1309 (9th Cir. 1996); *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 406 (6th Cir. 2013) (same); *see Humane Soc'y of U.S. v. Env't Prot. Agency*, 790 F.2d 106, 114 (D.C. Cir. 1986) ("A controversy concerning an initial permit . . . may simply continue in the context of succeeding permits." (alteration, internal quotation marks,

---

[3]As part of the renewal permitting process after SW Research filed this appeal, NMED published a draft renewal permit for public comment, as required by 20.4.1.901 NMAC. With it, NMED published a fact sheet setting forth the twenty-five proposed changes to the expiring permit that would be included in the renewal permit. The fact sheet did not include any changes to the construction of shaft five or to any other terms of the PMR at issue in this appeal.

and citation omitted)); *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 183 F. Supp. 3d 1137, 1144 (D. Colo. 2016) (holding that the renewal of a license does not moot a controversy concerning the original license).

{9} We find this authority persuasive. Since Permittees do not contend, and the facts do not show, that the renewal of the permit resolved or changed the controversy now before this Court, we conclude that this controversy is not moot. Stated differently, appellate review of the Secretary's final order in this instance has not been circumvented by ensuing permitting processes. We therefore turn to SW Research's arguments on the merits.

**II.    NMED's Order Is Supported by Both the Law and the Evidence in the Record of Current Need for the Modifications**

{10} SW Research appeals from the NMED's final order, raising six issues on appeal. SW Research claims first that Permittees failed to establish by substantial, credible evidence in the record that the fifth airshaft, the connecting drifts, and the other changes to the WIPP facility's ventilation system sought in the PMR are needed to complete already authorized operations at WIPP. SW Research argues that Permittees' willingness to spend $197 million on the construction of the modifications to the ventilation system sought by the PMR can be explained only as a step toward an expansion of WIPP far beyond its approved size, period of operation, and type of waste. According to SW Research, the fifth shaft and other costly modifications to the ventilation system have little or no independent utility

for authorized WIPP operations, and Permittees' claims to the contrary are not credible.

{11}     SW Research raises five additional issues, all of which are related to its claim that the fifth shaft and other modifications to the ventilation system are unnecessary for currently authorized operations and are sought solely to support an unauthorized expansion of WIPP. SW Research claims that (1) the hearing officer improperly excluded evidence concerning future WIPP expansion as speculative and irrelevant; (2) the notice to the community near the WIPP facility by NMED of its issuance of a draft permit and the notice to submit technical testimony were not timely given; (3) sufficient Spanish translation of the PMR documents and process was not provided to the public; (4) the Secretary's approval of the PMR violates restrictions on the expansion of WIPP included in the 1987 Consultation and Cooperation Agreement (C&C Agreement) between DOE and New Mexico; and (5) the constitutional requirement for Congressional appropriation of federal funds was violated by the NMED's approval of the PMR.

**A.     Standard of Review**

{12}     We may set aside the Secretary's final order only it if is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74-4-14(C). "The burden is on the parties challenging the agency order to make this showing." *Sw.*

*Rsch. & Info. Ctr.*, 2014-NMCA-098, ¶ 21 (internal quotation marks and citation omitted).

{13} We review an agency's conclusions of law de novo. *See Law v. N.M. Hum. Servs. Dep't*, 2019-NMCA-066, ¶ 11, 451 P.3d 91. "When reviewing findings of fact made by an administrative agency we apply a whole record standard of review." *Fitzhugh v. N.M. Dep't of Lab.*, 1996-NMSC-044, ¶ 23, 122 N.M. 173, 922 P.2d 555. "In applying whole record review, this Court reviews both favorable and unfavorable evidence to determine whether there is evidence that a reasonable mind could accept as adequate to support the conclusions reached by the fact[-]finder." *Ruiz v. Los Lunas Pub. Schs.*, 2013-NMCA-085, ¶ 5, 308 P.3d 983 (internal quotation marks and citation omitted). We are cautioned by our Supreme Court that "[w]hole record review is not an excuse for an appellate court to reweigh the evidence and replace the fact[-]finder's conclusions with its own." *Herman v. Miners' Hosp.*, 1991-NMSC-021, ¶ 10, 111 N.M. 550, 807 P.2d 734. If there is substantial evidence to support the findings of fact, we affirm those findings unless other evidence in the record so undercuts the findings that they are unreasonable. *See, e.g., id.* (finding administrative decision reasonable notwithstanding conflicting evidence). Applying these standards of review, we address each issue in turn.

**B.     Permittees Made a Sufficient Showing of Need for a Fifth Airshaft Based on the Currently Authorized Operation of WIPP**

{14}    We address first SW Research's challenge to the sufficiency of the evidence relating to the need for a fifth airshaft to support currently authorized operations at the WIPP facility. *See* 40 C.F.R. § 270.42(c)(1)(iii) (requiring a showing of need for the modification to support current operations). This Court has held that a permittee satisfies the requirement for a showing of current need if NMED determines that the permittee's statement of need in the PMR (1) is justified for the reasons stated in the PMR, (2) is substantiated by data, (3) is an "adequate statement" of the need, and (4) appellants do not demonstrate otherwise. *Sw. Rsch. & Info. Ctr.*, 2014-NMCA-098, ¶ 26. As previously mentioned, SW Research, as the appellant, bears the burden of demonstrating reversible error in NMED's decision. *See id.* ¶ 21.

{15}    Permittees stated in the PMR that the modifications are needed to address limited ventilation capacity that has persisted at WIPP because a 2014 radiological event contaminated portions of the ventilation and exhaust systems, requiring the facility to operate on a limited filtration mode ever since. Permittees claim that without the restoration of the lost ventilation capacity, the WIPP facility cannot simultaneously perform underground maintenance, mining, and waste disposal, and that this significantly reduces the efficiency of the underground activities necessary for WIPP to complete its authorized mission. The hearing officer agreed.

10

{16}    SW Research argues that Permittees are hiding the real reason such a major overhaul of the ventilation system is needed: that a $197 million investment in excavation of a new shaft can be justified only to ventilate a substantially expanded WIPP facility that accepts an increased amount of waste (including waste that is more severely contaminated), and that continues to operate for decades into the future, well beyond any current estimates of shutdown. According to SW Research, the Permittees' statement of current need is contrived to hide the fact that the costly modifications to the ventilation system that are proposed have "little or no independent utility," and that Permittees' ulterior motive is to install an expensive ventilation system in the hope that this expenditure "would commit the Permittees to continue with operation and, therefore, [lead to] expansion of disposal capacity" of the WIPP facility.

{17}    In support of its position that the PMR cannot be justified based on currently authorized operations at WIPP, SW Research first contends that, as a matter of law, WIPP was scheduled to cease disposal operations in 2024. SW Research argues that the new ventilation system could not be completed before the end of 2025, at the earliest, after operations at WIPP should have ceased.

{18}    SW Research, however, fails to point to any statutory or regulatory requirement ending disposal operations at WIPP in 2024. The sole citation provided is to a statement in the 2010 operating permit that the disposal phase of WIPP is

11

"expected" to end in 2024. That permit, of course, was adopted before the 2014 radiological event temporarily shut down the facility and permanently reduced its efficiency and capacity. The Permittees argue, and the hearing officer and NMED concluded, that WIPP is authorized by Congress by the LWA to dispose of up to 6.2 million cubic feet of transuranic waste—an amount that will not be achieved until long after 2024—and which will be followed by an extended period where workers will need to work inside the facility to close off the disposal tunnels, and to perform other facility closure and decommissioning activities. SW Research offers no authority to contradict the LWA's measure of WIPP capacity, or of the expectation that an extended period will be required for closure, during which workers will need ventilation, and we have located none.

{19} SW Research next claims that, even if WIPP is authorized to continue full operations, including disposal of waste after 2024, Permittees' do not need to increase the volume of airflow because the airflow volume has already been restored to the level achieved prior to the 2014 contamination event. SW Research's argument is directly contrary to the finding of the hearing officer, adopted by NMED, that the existing ventilation system limits airflow to a small percentage of the flow available before the 2014 incident.

{20} To support its argument, SW Research turns to what it alleges are contradictions in the testimony of Permittees' technical expert witnesses, Dr. Jill

Farnsworth and Robert Kehrman. SW Research points to Dr. Farnsworth's testimony that the new filtration building, which was separately authorized and had been completed at the time of the hearing on the PMR for the fifth shaft, is alone capable of producing 540,000 ACFMs, an airflow equivalent to the pre-2014 levels. Although Dr. Farnsworth stated that the filtration building can achieve this level of airflow, additional expert testimony explains that the filtration building was not designed to sustain this level; it was designed as what the hearing officer described in his findings as "a defense in depth," a backup system that could take over temporarily in an emergency to protect workers and the environment if the normal ventilation system fails. Expert Kehrman noted that "[t]he filtration system, as originally designed, can accommodate only a small percentage of the original design airflow," and the addition of a fifth ventilation shaft "will support a new intake and exhaust system capable of restoring full-scale, concurrent, unfiltered mining, maintenance, and continuously filtered waste emplacement operations."

{21} The explanation given by Permittees' technical witnesses of the need for a fifth airshaft is reasonable. We note that SW Research does not challenge the qualifications of Permittees' experts. We will not disturb a finding supported by substantial evidence in the record and not shown to be unreasonable. *Herman*, 1991-NMSC-021, ¶ 10.

{22}     SW Research next challenges the testimony of Permittees' experts that the amount of airflow is not the only measure, and that more than an adequate amount of airflow is needed to safely conduct all operations simultaneously. Permittees' technical experts point to the ability of the planned fifth shaft to exhaust unfiltered salt particles generated from construction sites at WIPP, and to the advanced control of air pressure throughout the facility that the fifth shaft would allow WIPP to achieve. SW Research argues that these improvements in ventilation are so minor, and so much money is being spent to achieve them, that it is "obvious" that the claim that these improvements are sufficient to show need for the fifth shaft is a sham.

{23}     We do not agree that it is "obvious" that these improvements are unimportant to the continued operation of WIPP. The hearing officer found significant improvement in the efficiency of the facility, in worker safety inside the facility, and environmental safety in the surrounding community would be achieved by these changes to the ventilation system. Our review of the record shows that the hearing officer's findings of fact on the benefits of both unfiltered exhaust of salt particles and regulation of air pressure are supported by detailed expert testimony. Permittees' experts testified, for example, that avoiding having to filter construction exhaust filled with salt particles would prevent the current contamination of salt particles and construction debris with radioactive particulates. According to the expert testimony, the mixing of contaminated and uncontaminated salt and debris that occurs in the

existing combined filtration system, requires all of the material caught by the filters to be treated as radioactive waste, increasing the volume of waste that must be stored at WIPP, and endangering the workers who are required to remove and safely store this radioactive material when replacing the filters.

{24}     Expert testimony also highlighted the importance of being able to control the air pressure in the WIPP facility. Controlling air pressure will ensure that the airflow moves from outside clean air, through areas where construction or maintenance is underway, to the disposal areas, where radioactive material is stored, ensuring that any radioactive release does not contaminate the air breathed by workers or escape into the environment.

{25}     This evidence, which the hearing officer found credible, is sufficient to support the hearing officer's and the NMED's finding that the excavation of a fifth shaft, is "necessary to have a fully functioning facility with enhanced ventilation systems to ensure that [WIPP] operations can progress in a manner that protects human health and the environment and provides optimal safety for its workers." We conclude that SW Research has not met its burden of demonstrating reversible error.

**C.     The Hearing Officer Properly Excluded Evidence of Possible Future Expansion of WIPP as Irrelevant to the PMR**

{26}     SW Research argues next that the hearing officer erred by excluding evidence of unapproved proposals for the future expansion of WIPP from the evidence introduced at the hearing. According to SW Research, discussing the existence of

15

proposals to expand WIPP by increasing its period of operation and by expanding the amount and type of waste that could be stored, and exploring the impact on the community of any expansion, was of central importance to the decision on whether to grant the PMR. SW Research contends that this evidence is relevant to the decision to allow the construction of the fifth shaft because it would expose Permittees' ulterior motive for the modification of the ventilation system.

{27} "With respect to the admission or exclusion of evidence [in an administrative proceeding], we generally apply an abuse of discretion standard where the application of an evidentiary rule involves an exercise of discretion or judgment, but we apply a de novo standard to review any interpretations of law underlying the evidentiary ruling." *Dewitt v. Rent-A-Ctr., Inc.*, 2009-NMSC-032, ¶ 13, 146 N.M. 453, 212 P.3d 341.

{28} Recognizing that SW Research and many members of the public were eager to testify against any expansion of WIPP, and that expansion would be a major focus of the hearing if this testimony was admitted, NMED filed a motion in limine to prohibit the introduction of evidence concerning future expansion of WIPP. Although NMED acknowledges that Permittees' would likely file a separate Class 3 PMR in the future seeking to add additional disposal panels to the WIPP permit to replace those contaminated in 2014, it argued that this was irrelevant to these PMR proceedings, which required Permittees to show the need for the modifications they

sought based on the currently authorized operation of WIPP, and not based on speculation about whether an expansion would be authorized in the future. NMED claimed that the only evidence relevant to the hearing officer's recommendation to approve the PMR was evidence showing or evidence rebutting the current need for the proposed modifications.

{29}   The hearing officer granted the motion in limine in part, excluding "evidence of future expansion of [WIPP]" at the hearing because it was not relevant to the approval or denial of the PMR. We agree with the hearing officer that evidence about plans for a future expansion of WIPP were irrelevant to the grant or denial of the PMR. The hearing officer's ruling required both sides to focus on the issue at hand: whether the modifications of the ventilation system were needed for the current, authorized operation of WIPP, assuming WIPP was not expanded. This was a significant limitation on the testimony of Permittees' experts, as well as on SW Research and the other opponents of the modification. The ruling acknowledged the requirements of the regulations, forcing the Permittees to come forward with expert testimony and data showing that the proposed modification was needed for the current operation of WIPP, and that it would improve the protections for workers' health and the environment during the currently authorized operation. *See* 20.4.1.901(B)(7) NMAC (providing that "[i]n a permit modification under this section, only those conditions to be modified shall be reopened"). The decision to

exclude evidence of the possibility of WIPP expansion similarly forced SW Research and other opponents of the PMR to introduce expert evidence and data rebutting the claims of current need, showing—rather than simply asserting—that the modifications to the ventilation system could not be justified based on current operations.

{30} SW Research argues that our Supreme Court's decision in *In re Application of Rhino Environmental Services*, 2005-NMSC-024, 138 N.M. 133, 117 P.3d 939, supports the relevance of the evidence of future expansion excluded by the hearing officer. *Rhino* stands for the proposition that an administrative hearing officer, in approving a landfill, must "listen to [the community's] concerns about adverse impacts on social well-being and quality of life, as well as report them accurately to the Secretary," and cannot rely solely on technical evidence. *Id.* ¶ 24. In this proceeding, neither the public testimony nor the testimony by interested parties at the administrative proceeding concerning the adverse impacts on quality of life, health, or the environment of the requested modifications in the ventilation system was limited. Evidence concerning the impact of the excavation of a fifth shaft and the changes to the ventilation system was welcome and findings on these matters were entered by the hearing officer and adopted by NMED.

{31} SW Research's concern appears to be with the limitation of evidence on the impact of *the expansion of WIPP* on the environment and the community. As we

18

have already explained, the PMR proceeding did not authorize any expansion of WIPP. Any future expansion must include the opportunity for both public comments and evidence on the impact of expansion on the environment, workers, and the community.

{32} For these reasons, we find that NMED did not abuse its discretion in excluding testimony about WIPP expansion.

### III. Permittees and NMED Substantially Complied with the Statutory and Regulatory Notice Requirements, and Provided Meaningful Notice to the Public

{33} SW Research contends that the NMED's notice to the public during the PMR process violated the statutory and regulatory requirements in three ways, any one of which requires reversal and remand for new proceedings: (1) notice of the issuance of a draft permit by NMED—the second step in the process, after public comment has been considered on the submittal of the PMR to NMED—was not timely provided to the local Carlsbad community by publication in a local newspaper and by public service announcement on local radio broadcasts, as required by the regulations; (2) the notice given prior to the deadline for submission of expert testimony was inadequate given the importance and complexity of the issues at stake, and the timing of the hearing officer's ruling on Permittees' motion in limine further limited SW Research's ability to prepare expert testimony; and (3) NMED

failed to translate into Spanish and make available to the public all important documents related to the PMR. We address each contention in turn.

**A.     NMED Cured Any Deficiency, Providing Adequate Local Notice**

{34}     SW Research contends first that NMED failed to provide timely local notice of its issuance of the draft permit, as required by 20.4.901(C)(3) NMAC. The hearing officer addressed this issue in his report, concluding that NMED's failure to provide notice on June 12, 2020, (the day the draft permit was issued) in the local Carlsbad newspaper and on local radio stations, created a deficiency under 20.4.1.901(C)(3) NMAC, but that NMED cured the deficiency when it published a subsequent notice in two local newspapers and by a public service announcement on local radio stations on March 18, 2021, more than sixty days before the hearing on the PMR, and noticed a sixty-day renewed public comment period, which extended until the end of the upcoming hearing. We agree with the hearing officer's determination.

{35}     Upon issuance of a draft permit, NMED must provide public notice "by publication of a notice in a newspaper of general circulation in the area affected . . . [and] broadcasts over local radio stations." 20.4.1.901(C)(3) NMAC. The regulation requires NMED to allow forty-five days for review and public comment following the publication of the notice. 20.4.1.901(A)(3) NMAC. It is undisputed that NMED did not publish the required notice in local media at the time the draft permit was issued, publishing only in the Albuquerque Journal (a newspaper of general

circulation) and broadcasting on radio stations that serve large areas of the state, but which do not target the local Carlsbad community.

{36} "Although some courts have held that even a minor defect in notice will invalidate an action taken by [administrative agencies], New Mexico does not take such a strict view." *Nesbit v. City of Albuquerque*, 1977-NMSC-107, ¶ 3, 91 N.M. 455, 575 P.2d 1340 (citation omitted). Instead, our test is whether "publication of notice substantially compl[ies]" with the statutory requirements. *Martinez v. Maggiore*, 2003-NMCA-043, ¶ 13, 133 N.M. 472, 64 P.3d 499. Notice substantially complies if it allows the public the ability to "meaningfully participate in the permitting process." *Id.* ¶ 17.

{37} NMED's failure to publish notice of its issuance of the draft permit violated a regulatory requirement. Under this standard of law, however, this does not end our inquiry. We look to see whether the notice given to the public, as a whole, allowed the public to meaningfully participate in the permitting process. The draft permit was issued in June 2020. Notice of the issuance and a sixty-day comment period, ending in August 2020, was given in the state's largest newspaper and broadcasted over the radio. Following that comment period, the persons who requested a public hearing—including SW Research—participated in negotiations with Permittees and NMED to see whether the parties could reach a compromise. The public hearing was not scheduled until March 2021, nearly a year after NMED issued the draft permit.

At that time, NMED published public notice in the Carlsbad newspapers and provided a public service announcement on Carlsbad radio stations of its decision to proceed to a public hearing on the draft permit. At the same time, NMED reopened public comments and agreed to take written comments for a full sixty days, until the conclusion of the public hearing. Members of the local community were also invited to testify at the public hearing.

{38}     We note that this sixty-day period of public comment, followed by a public hearing at which any interested person was invited to testify followed more than three years of public consideration of the changes to the ventilation system at WIPP, including the construction of a fifth airshaft. The public process began in 2017 with an initial filing of a PMR by Permittees for both a new filtration building and the addition of a fifth ventilation shaft. Public meetings were held in Carlsbad to discuss this joint PMR with the local community.

{39}     Following these community discussions, Permittees decided to proceed first with the filtration building, and withdraw the PMR for the fifth shaft until a later time. After construction of the filtration building, Permittees refiled the PMR for the fifth shaft at issue in this appeal, and a new set of public notice and public proceedings on the fifth shaft was begun. The notice of the issuance of the draft permit was the third opportunity for the local community to comment on the construction of the fifth airshaft and associated drifts.

**{40}** In this context of extensive local involvement and public knowledge that the PMR process was underway, we agree with the hearing officer that the error in local publication on the third of four public comment periods was corrected by the notice in Carlsbad, along with an additional sixty-day public comment period, followed by the public hearing with participation by zoom available statewide. Local residents were provided a meaningful opportunity to participate in the decision to allow construction of a fifth shaft, and NMED substantially complied with the notice requirements.

**B.      NMED's Notice of Public Hearing Was Sufficient and the Hearing Officer's Order Excluding Irrelevant Evidence Did Not Change the Nature of the Proceeding**

**{41}** SW Research next argues that NMED's March 18, 2021 notice of public hearing, sixty days prior to the hearing, followed by the decision on the motion in limine excluding testimony about plans for a future expansion of WIPP, deprived SW Research of the opportunity to adequately prepare expert testimony. SW Research claims that all proceedings along the way, and most importantly the notice of public hearing issued in March 2021, requested comments on the expansion of WIPP, and therefore, the hearing officer's order in limine changed the nature of the proceeding at the last minute. The record does not support this claim.

**{42}** Contrary to SW Research's argument, the notice of hearing expressly limited the hearing to the "[c]hanges to the[] Permit," stating that "the proposed new shaft

23

in facility and ventilation configuration" are the "subject of the modification and are the only portions to be opened in this proceeding." The hearing officer's order on the motion in limine did not change the nature of the noticed proceedings. It was clear from both the regulations and the notice of hearing that speculation about the future expansion of WIPP was not relevant to the subject of the hearing: whether there was a current need based on the authorized operation of WIPP for the new ventilation shaft.

{43} SW Research relies on a single sentence taken from a fact sheet distributed by NMED with the notice of hearing, arguing that this sentence in a secondary document amounts to an invitation to comment on WIPP expansion at the hearing. We do not agree. The fact sheet reports that "[a] primary concern raised by commenters was the proposed new shaft's relation to expansion of the [f]acility's footprint," before noting that expansion is not at issue in the upcoming hearing on this PMR, and would be considered in separate proceedings in the future.

{44} We conclude that SW Research and the public were on notice long before the motion in limine was granted of the testimony that would be relevant to NMED's decision on whether to grant the PMR, and that no prejudice resulted from the ruling on the motion in limine.

**C.     Limited English Proficiency Spanish Speakers Were Not Denied Participation**

{45}     In its final argument related to notice, SW Research makes a broad assertion that limited English proficiency Spanish speakers were "almost totally denied meaningful participation" in the PMR process because NMED allegedly failed to translate vital information into Spanish. The hearing officer found that NMED substantially complied with all requirements for Spanish translation, citing to unrefuted testimony in the record that Spanish translations of every significant announcement and decision related to the PMR were publicly available, and that four Spanish language interpreters provided live interpretation of the hearing on both the Zoom platform and telephonically. SW Research does not dispute the hearing officer's finding of fact, or explain why it believes these translations were inadequate. Therefore, we do not address this issue further. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.").

**IV.     SW Research Claims of Violation of the C&C Agreement and of the Appropriations Clause of the United States Constitution**

{46}     We address SW Research's two remaining arguments together. SW Research argues that NMED's approval of the PMR violates both (1) the C&C Agreement between New Mexico and DOE, and (2) the Appropriations Clause of the United States Constitution. Although these arguments are inadequately developed, we

25

understand SW Research's argument to be that the approval of the fifth shaft either authorizes an illegal expansion of WIPP, or is a pretext, making such expansion inevitable, and that NMED's authorization to Permittees to build the fifth shaft, therefore, violates both the federal-state agreement on WIPP found in the C&C Agreement, or expends federal funding without Congressional appropriation. Because we have concluded that substantial evidence supported NMED's approval of the PMR to improve the ventilation system to serve WIPP's current needs, we do not address these arguments.

**CONCLUSION**

{47}    For the above reasons, we affirm.

{48}    **IT IS SO ORDERED.**


_____
**JANE B. YOHALEM, Judge**

**WE CONCUR:**


_____
**J. MILES HANISEE, Judge**


_____
**MEGAN P. DUFFY, Judge**